**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BAKER HUGHES INCORPORATED, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-11-3757 |
| DANIEL S. HOMA, *et al.*, | § § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Baker Hughes Incorporated and Baker Hughes Oilfield Operations, Inc. (together, "Baker Hughes") sued two former employees, Daniel S. Homa and Robert W. Harman; their new employer, FCTech, Inc.; and FCTech's affiliated companies, FCT Fiber Cable Technology GmbH ("FCT"), NBG Systems GmbH, and NBG Holding GmbH. (Docket Entry No. 66). Homa and Harman have since been dismissed from this lawsuit. (Docket Entry Nos. 94–95). The claims against FCTech have been severed and stayed based on its bankruptcy filing. (Docket Entry No. 97). The remaining defendants are NBG Holding and its subsidiaries, FCT and NBG Systems (collectively, the "Austrian Defendants"). The Austrian Defendants have moved to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and for insufficient service of process under Rule 12(b)(5). (Docket Entry No. 84). Baker Hughes has responded and has supplemented that response. (Docket Entry Nos. 98–99). The Austrian Defendants have replied. (Docket Entry No. 101).

Based on the pleadings, the motion and responses, the record, and the applicable law, this court orders further discovery to determine whether this court has personal jurisdiction over the Austrian Defendants and whether FCT and NBG Systems were properly served through the Texas Secretary of State. The Austrian Defendants' motion to dismiss, (Docket Entry No. 84), is denied without prejudice and with leave to reurge with the results of this targeted discovery.

The reasons for these rulings also are explained below.

## I.    Background[1] and Procedural History

The plaintiffs are Baker Hughes, Inc., a Delaware corporation with its principal place of business in Houston, and Baker Hughes Oilfield Operations, Inc., a California corporation with its principal place of business in Houston. (Docket Entry No. 66, ¶¶ 1–2). The plaintiffs are collectively referred to as "Baker Hughes."

Baker Hughes is an oil-field service company. "One of [its] primary goals is to provide technological solutions to the oil and gas industry for the safer and more efficient production of hydrocarbons." (*Id.*, ¶ 13). One technology Baker Hughes focuses on is fiber-optic sensing technology. (*Id.*). Although Baker Hughes directs the research and development of that technology from its Houston headquarters, its research-and-development facility for the technology is located in Blacksburg, Virginia. Baker Hughes also manufactures optical fiber and fiber-optic equipment in that Virginia facility. (*Id.*, ¶ 28).

"CoreBright" is among the fibers that Baker Hughes has researched, developed, and manufactured at the Virginia facility. Developing CoreBright took Baker Hughes "many years of

---

[1]The facts summarized below come from the amended complaint, the attachments to that complaint, as well as other exhibits in the record. *See Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 344 (5th Cir. 2002) (explaining that a district court "may consider the contents of the record before the court at the time of the motion" in deciding a motion to dismiss for lack of personal jurisdiction).

research and tens of millions of dollars in financial investment."  (*Id.*, ¶ 20).  Baker Hughes owns patents on CoreBright and on the manufacturing method for it.  (*Id.*).  Baker Hughes alleges that because of the uniqueness of CoreBright and other fiber-optic sensing technology that it has developed, the trade secrets and confidential and proprietary information[2] related to that technology are "highly valuable."  (*Id.*, ¶ 27).  Baker Hughes alleges that it "takes precautions"—restricting access to its research-and-development facility and to its computer server containing that research and development, and requiring employees to sign an agreement restricting the disclosure and use of its trade secrets and confidential and proprietary information—to protect from nondisclosure. (*Id.*, ¶ 26).

Baker Hughes hired Daniel Homa, a Virginia resident, in October 2004.  (*Id.*, ¶ 3 & Ex. A). Homa served as an engineer at Baker Hughes's Virginia facility.  According to the complaint, Homa

> had worked for BHI [Baker Hughes], or a BHI predecessor, for more than ten years and was integrally involved in BHI's fiber optic research and development.  Homa is the named inventor on seven issued BHI patents and numerous pending and soon to be pending BHI patent applications.  While working for BHI, Homa was involved in all areas of optical fiber design, development and manufacture and was thus exposed to virtually all of BHI's trade secrets and confidential and proprietary information regarding BHI's fiber optic technology, including BHI's proprietary CoreBright™ technology.

(*Id.*, ¶ 29).

Baker Hughes hired Robert Harman, a Virginia resident, in May 2008.  (*Id.*, ¶ 4 & Ex. B). Harman served as the Engineering/Plant Manager of the Virginia facility, which placed him in charge of the facility's entire operations.  According to the complaint, "Harman was exposed not

---

[2]For ease, the court refers to the phrase "trade secrets and confidential and proprietary information" simply as "trade secrets."

only to BHI's fiber optic technology but also to all of BHI's future business plans, business relationships, including with BHI's customers and vendors, price lists, business strategies, and business opportunities in fiber optics." (*Id.*, ¶ 30).

Baker Hughes alleges that Homa's and Harman's responsibilities required their constant interaction with the Baker Hughes headquarters in Houston.  In particular, Homa and Harman "reported to and received directions, particularly in the research and development of fiber optics technology, from their supervisors located at BHI's headquarters in Houston, Texas." (*Id.*, ¶ 31). Additionally, they traveled to Houston to attend meetings with their supervisors.  "The objectives of these meetings were to further the development of BHI's trade secrets and confidential and proprietary information related to its fiber optic technology[.]" (*Id.*).

Baker Hughes required Homa and Harman to sign employee agreements when they began working.  The agreements included the following provisions:

- "Employee will not engage in any activities that are in conflict or interfere with Employee's responsibilities as an employee of the Company." (*Id.*, Exs. A & B, ¶ 1).

- "Employee agrees that any and all Trade Secrets, Proprietary Information, inventions . . . , and all designs, discovered, conceived and/or developed, either individually or jointly with others, during the course of Employee's employment (either during working hours or otherwise and whether discovered, conceived and/or developed on the premises of the Company, at home or elsewhere), which relate to subject matter within a field of interest to Company, or discovered, conceived and/or developed using the Company's time, data, facilities and/or materials, are the exclusive property of the Company[.]" (*Id.*, Exs. A & B, ¶ 2).

- "Employee agrees that any and all memoranda, notes, records, drawings, forms, computer software or listings, business records, manuals, and any other documents, materials and tangible items made or compiled by Employee or made available to Employee, whether by the Company or third parties engaged in or contemplating business with the Company, while Employee is employed by the Company are and shall be the exclusive

property of the Company and shall be delivered to the Company upon termination of Employee's employment, or at any time upon request." (*Id.*).

•   "During Employee's employment and for two (2) years after termination of Employee's employment, Employee will not, either directly or indirectly, either solely or in combination or conspiracy with others (whether or not they are employed by the Company), (a) employ, or attempt to employ or solicit for employment, any Company employee, or (b) induce, encourage or influence, or attempt to induce, encourage or influence, any Company employee to leave the Company's employment." (*Id.*, Exs. A & B, ¶ 5).

•   "In order to protect Company against the disclosure of the Company's Trade Secrets and Proprietary Information, Employee understands and agrees that Employee shall not, either during Employee's employment or thereafter, directly or indirectly, use for Employee's benefit or for the benefit of another, or disclose to any person, firm, or corporation, any such Trade Secrets and Proprietary Information without the Company's prior written authorization." (*Id.*, Exs. A & B, ¶ 6).

Other provisions stated that the agreements were "deemed to have been made in Houston" and governed by Texas law "without regard to the place of execution or the place of performance of this Agreement." (*Id.*, Exs. A & B, ¶ 13).

In mid-2010, Homa and Harman initiated a business relationship for Baker Hughes with NBG Holding GmbH, FCT Fiber Cable Technology GmbH ("FCT"), and NBG Systems GmbH—the Austrian Defendants. (*Id.*, ¶ 39). The Austrian Defendants are privately held corporations with their principal places of business in Austria. (Docket Entry No. 84, Ex. A, ¶¶ 4–7).[3] The complaint refers to these companies collectively as "FCT." (*See* Docket Entry No. 66).

---

[3]Baker Hughes has moved to strike the affidavit of Karl Bauer on two grounds: first, that it is an unauthenticated foreign public document under Federal Rule of Evidence 902(3); and second, that it conflicts with Bauer's deposition testimony and other record documents. (Docket Entry No. 98, at 8). The second ground is not a basis for striking an affidavit at the motion-to-dismiss stage. The first ground also does not provide a basis for striking the affidavit. Even assuming that an affidavit executed outside of the United States qualifies as a foreign *public document*, "[a] foreign document that has been acknowledged or notarized may be self-authenticating under Rule 902(8)." 31 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE § 7137 (2000). Under that rule, "[a] document accompanied by a certificate of acknowledgment that is lawfully executed by a notary public or other officer who is authorized to take acknowledgments" is self-authenticating. FED. R. EVID. 902(8). The affidavit, signed by Bauer in Austria and executed by an Austrian notary public, meets the rule's requirements.

5

To avoid confusion with the other companies, the court refers to them collectively as the "Austrian Defendants."

NBG Holding is an Austrian holding company.  It owns, in whole or in part, subsidiaries that, with the exception of FCTech, Inc., are companies formed under the laws of Austria or other foreign countries.  NBG Holding has only one office, located in Austria.  NBG Holding neither markets nor produces goods or services.  Aside from hiring a Virginia attorney to assist with forming FCTech, NBG Holding has never "utilized any vendor or supplier" or entered into any contract or business agreement with any person or entity in the United States.

Karl Bauer is one of NBG Holding's four owners.  (*Id.*, Ex. A, ¶ 7).  He also serves as NBG Holding's CEO and as one of its managing directors.  (*Id.*, Ex. A, ¶ 2; *see also, e.g.*, Docket Entry No. 98, Ex. 11, at 2 (Bauer's e-mail signature block)).

FCT is a subsidiary of NBG Holding.  NBG Holding owns 80% of FCT's shares, while another Austrian corporation owns the remaining 20%.  FCT has one office, located in Austria, where it conducts all of its business.  "FCT manufactures fiber in metal tubing ('FIMT') products for sale in geographic markets outside Austria."  (Docket Entry No. 84, Ex. A, ¶ 5).  Bauer serves as a managing director of FCT.  (*Id.*, Ex. A, ¶ 2).  Bauer also has identified himself in documents as the CEO of FCT.  (Docket Entry No. 66, Ex. C, at 4).

NBG Systems is a subsidiary of NBG Holding.  NBG Holding owns 95% of NBG Systems's shares; an Austrian NBG Holding executive owns the remaining 5%.  NBG Systems's principal

---

At the same time, many statements in Bauer's affidavit are not factual assertions but rather conclusions of law. (*See, e.g.*, Docket Entry No. 84, Ex. A, ¶¶ 10 ("The NDA . . . was not performable in the State of Texas."), 14 ("NBG Holding, NBG, and FCT has not committed any torts in the State of Texas[.]").  To the extent that the affidavit contains legal conclusions, the court has disregarded them. *See Ramon v. Continental Airlines Inc.*, 153 F. App'x 257, 259 (5th Cir. 2005) (per curiam).

place of business is in Austria.  It has no offices in the United States.  "NBG [Systems] has a business relationship with FCT to market FCT's FIMT products in geographic markets outside Austria."  (Docket Entry No. 84, Ex. A, ¶ 6).  Bauer serves as a managing director of NBG Systems. (*Id.*, Ex. A, ¶ 2).

In mid-2010, Homa and Harman contacted FCT "to explore the possibility of FCT making FIMT" for Baker Hughes's CoreBright fiber.  (Docket Entry No. 84, Ex. A, ¶ 10; *see also* Docket Entry No. 66, ¶ 39).  On June 7, 2010, Homa e-mailed another Baker Hughes employee to have FCT set up as a vendor in Baker Hughes's computer system.  For the contact with FCT, Homa listed Andreas Giannis, "US & CA Director of Sales" for NBG Systems, as well as Giannis's NBG e-mail address.  (Docket Entry No. 98, Ex. 1, at 1).  On June 15, Baker Hughes Oilfield Operations and FCT entered into a nondisclosure agreement "to review and evaluate the possibility of entering into a business arrangement" in which FCT would provide FIMT to Baker Hughes "for its use in the oil and gas industry[.]" (Docket Entry No. 66, Ex. C, at 1).  The agreement required Baker Hughes Oilfield Operations and FCT to exchange confidential and proprietary information within six months.  (*Id.*, Ex. C, ¶ 1).  A vice-president signed the agreement on behalf of Baker Hughes, and Bauer signed the agreement as CEO of FCT.  (Docket Entry No. 66, Ex. C, at 4).

Communications continued as Baker Hughes's business relationship began with FCT.  To set up FCT as a vendor, a Baker Hughes employee e-mailed two forms to Giannis, who filled them out and signed them on behalf of NBG Systems.  To complete the vendor registration, an NBG Holding employee e-mailed a "company report" to Baker Hughes, although it is unclear which company report was sent.  (Docket Entry No. 98, Ex. 3).  On June 22, Bauer completed Baker Hughes's "Direct Deposit Authorization" form.  For the legal name of the business, Bauer listed

NBG Systems. Bauer listed Giannis as the company's contact, identifying his position as Area Sales Manager. Bauer signed the form, above an NBG Systems business stamp, as Managing Director. (*Id.*, Ex. 5).

In September 2010, a team from FCT visited Baker Hughes's Virginia facility. Representing FCT were Bauer, Giannis, and a third person; representing Baker Hughes were Homa, Harman, Doug Norton—a Houston-based Senior Technical Advisor for fiber-optics sensing, (*id.*, Ex. 16, ¶¶ 1–2)—and a fourth Baker Hughes employee. (*Id.*, Ex. 7, at 113).

The nondisclosure agreement expired in December 2010. After that date, Homa and Harman "continued to meet with FCT and to work with FCT to develop FIMT incorporating [Baker Hughes]'s fiber, even though the NDA was not renewed and FCT was not required to sign a Joint Development Agreement[.]" (Docket Entry No. 66, ¶ 41). According to Baker Hughes, Harman (as Engineering Manager) was required either to renew the nondisclosure agreement with FCT or to have FCT sign a Joint Development Agreement for FCT to continue working with Baker Hughes. (*Id.*).

Throughout 2010 and 2011, Baker Hughes and FCT, NBG Systems, or both, entered into numerous purchase orders. Baker Hughes ordered FIMT from FCT, NBG Systems, or both. (Docket Entry No. 98, Ex. 8). The purchase orders listed both FCT and NBG Systems under the vendor name. The orders also stated that "[t]he rights, duties and obligations described herein arose and are performed in Harris County, Texas[.]" (*E.g.*, *id.*, Ex. 8, at 9). The purchase orders stated that FCT or NBG Systems were to ship the finished FIMT product to the Baker Hughes Virginia facility or to Baker Hughes facilities in Connecticut or North Carolina. The orders also stated that the invoices were to be sent to a Baker Hughes P.O. Box in Portland, Oregon. (*E.g.*, *id.*, Ex. 8, at

8

3, 15, 55).  Return invoices from these defendants came on NBG Systems letterhead.  (*E.g.*, *id.*, Ex. 8, at 1).  Some documents also came on FCT letterhead.  (*E.g.*, *id.*, Ex. 8, at 49).  For FCT or NBG Systems to fill these purchase orders, Homa and Harman would have to disclose some Baker Hughes trade secrets, despite the absence of a nondisclosure or joint-development agreement.  (*See* Docket Entry No. 66, ¶¶ 41–42).

"As of mid-2011, [the Austrian Defendants] had not been in the business of developing or manufacturing optical fibers or downhole fiber optic cables.  [The Austrian Defendants were] in the business of manufacturing the FIMT that protects the optical fibers."  (*Id.*, ¶ 43).  According to a document called "NBG company evolution" that Bauer wrote in 2010, some or all of the defendants—it is unclear because the document refers only to "we"—decided to expand NBG's focus from manufacturing FIMT to providing fiber-optic sensing technology, similar to Baker Hughes's role.  (Docket Entry No. 98, Ex. 9, at 2).  In 2011, some or all of the defendants decided to target the U.S. market for fiber-optic sensing technology in the fields of oil and gas, national defense, and medicine.  (*Id.*).

The planning for this targeted expansion allegedly began in March 2011, during a trip by Homa and Harman to Austria to meet with FCT about a purchase order.  Homa, Harman, Bauer, Giannis, and perhaps one other person had the idea to form a fiber-optics cable business during a dinner at the end of the trip.  (Docket Entry No. 98, Ex. 12, at 113–14; *see also* Docket Entry No. 66, ¶ 44).  When asked during his deposition whose idea it was to form this business, Harman was uncertain.  (Docket Entry No. 98, Ex. 12, at 114–15).  Throughout April, Homa, Harman, Bauer, and Giannis exchanged numerous e-mail to continue planning the business in the United States.  (*See id.*, Exs. 13–14).  These e-mails discussed Giannis's plans to attend the May 2011 Offshore

Technology Conference in Houston, where all four could meet and talk more about the planned business. Giannis suggested to Bauer that they combine the trip to the conference with a trip to Virginia, where the business would be established. According to Giannis, Doug Norton "will be there and I would like Karl [Bauer] to participate on these talks between us," apparently a reference to recruiting Norton to the new business. (*Id.*, Ex. 13, at 1). Giannis, however, denies attending the Offshore Technology Conference. (Docket Entry No. 101, Ex. B, ¶ 23). On April 20, Bauer e-mailed Homa, Harman, and Giannis to "express my intention to work together with you as a team" to create the new company, which Bauer called "the NewCo." (Docket Entry No. 98, Ex. 14, at 1). The core team, according to Bauer, would be Homa, Harman, and Giannis. Bauer envisioned Giannis as the NewCo's leader, with Harman bringing his knowledge of the oil-and-gas market and Homa bringing his knowledge of the "technical developments we need." (*Id.*). Bauer suggested "that during our meeting in Roanoke [Virginia] we will finalize all open points [about NewCo], take our common decissions [sic] and fix all our follow ups." (*Id.*).

Homa, Harman, Bauer, and Giannis met in Roanoke from May 5–7. Over these three days, the group appears to have discussed many details about establishing the NewCo. (*See generally* Docket Entry No. 98, Ex. 15). Ken Ferris, a Virginia businessman, attended some of the meetings According to Harman, Ferris would be able to set up meetings with local government business-development representatives about establishing the NewCo in the Roanoke Valley. (*See id.*, Ex. 13, at 1). Handwritten notes suggest that meetings with government representatives, and perhaps with area business leaders, occurred. (*See generally id.*, Ex. 15).

On May 12, Ferris e-mailed Bauer and Harman, as well as another person, to follow up on the meeting. Ferris listed fifteen "action items" that the group needed to work on to establish the

NewCo.  Many of these items required "NBG" to take action, although whether this refers to NBG Holding or NBG Systems is unclear.  (*Id.*, Ex. 11, at 1).  The group continued exchanging e-mails over the next ten days, eventually including Homa and Giannis on the e-mail thread.  In some of the e-mails, Giannis and Ferris discussed the possibility of recruiting employees from Baker Hughes's Virginia facility.  (*Id.*, Ex. 11, at 4–5).

In June 2011, Homa and Harman asked Baker Hughes to give them copies of their employment agreements.  According to the complaint, at the same time, they began negotiating the terms of their employment with the NewCo as "executives, officers, and part-owners of [the Austrian defendants'] newly-formed U.S. subsidiary, FCTech."  (Docket Entry No. 66, ¶ 45).  On July 1, FCTech, Inc. was incorporated under Virginia law.  (*Id.*, Ex. D).  FCTech had only one director: Karl Bauer of NBG Holding GmbH.  (*Id.*, Ex. D, at 2).  Homa's title at FCTech was Vice President of Technology; Harman's title was Vice President of Operations.  (Docket Entry No. 66, ¶ 45).

Sometime beginning in mid-2011, before Homa and Harman left Baker Hughes, they, along with Bauer, recruited Doug Norton to join FCTech.  Norton, a Houston resident, worked as a Senior Technical Advisor in fiber-optics sensing for Baker Hughes.  (Docket Entry No. 66, ¶ 61; Docket Entry No. 98, Ex. 16, ¶¶ 1–2).  According to Norton, "Rob Harman and Dan Homa told me that someone from FCT would be calling me to discuss an employment opportunity with FCT[.]" (Docket Entry No. 98, Ex. 16, ¶ 4; *see also* Docket Entry No. 66, ¶ 61).  Homa and Harman discussed the FCTech job as "a good opportunity."  (Docket Entry No. 98, Ex. 16, ¶ 4).  Bauer "called and emailed Mr. Norton, at [Baker Hughes]'s Houston facility, to discuss the job opportunity with [the defendants]."  (Docket Entry No. 66, ¶ 61; *see also* Docket Entry No. 88, Ex. 16, ¶ 4).

11

Bauer admits contacting Norton, but claims that he did so "on behalf of FCTech, Inc. and in my capacity as a director and CEO of FCTech, Inc." (Docket Entry No. 84, Ex. A, ¶ 8). E-mails show that in September 2011, Norton planned a trip to Roanoke to visit with Homa, Harman, and Giannis about joining FCTech. (*See* Docket Entry No. 98, Ex. 17). Giannis used his NBG e-mail address and copied Bauer using his NBG e-mail address. A member of NBG Holding's "Management Assistance" group contacted Norton to let him know that she was "responsible" for planning his trip to Roanoke. (*Id.*, Ex. 17, at 1). According to Bauer, no job offer was ever extended to Norton. (Docket Entry No. 84, Ex. A, ¶ 8).

While still employed by Baker Hughes, Homa and Harman used vacation time to travel internationally "on behalf of FCTech to purchase a lathe and draw tower for manufacturing optical fiber." (Docket Entry No. 66, ¶ 47). According to the complaint, Homa and Harman offered employment at FCTech to a Baker Hughes lathe operator, to begin as soon as FCTech's lathe and draw tower became operational. (*Id.*, ¶ 62).

On September 1, Homa and Harman gave two weeks' notice of their resignation from Baker Hughes. (*Id.*, ¶ 48). During this two-week period (and possibly before), Homa copied Baker Hughes information—some of which was stored on Baker Hughes's computer servers in Houston—onto two electronic-storage devices. These devices "contained substantially everything that existed on Homa's BHI computer, trade secrets and confidential and proprietary information that were stored on BHI's Houston servers, and basically anything he had worked on for the ten years he worked for BHI." (*Id.*, ¶ 56). Harman copied all of his Baker Hughes e-mails and contacts information to an electronic-storage device. "Many of the emails copied by Harman"—all of which were stored on Baker Hughes's Houston computer servers, "included BHI's trade secrets and

12

confidential and proprietary business contacts, as well as attachments that contain BHI's trade secrets and confidential and proprietary information related to optic fiber technology." (*Id.*, ¶ 59). Before leaving Baker Hughes, Homa and Harman deleted other files stored on the Houston computer servers. (*See id.*, ¶¶ 59–60).

Homa and Harman resigned effective September 13. (*Id.*, ¶ 48). The next day, the Austrian Defendants:

> held a press conference in Virginia announcing the formation of its U.S. subsidiary, FCTech. During the press conference, Karl Bauer, FCT's President and CEO, stated that FCTech planned to develop and manufacture "specialty optical fibers for sensing systems that have application to the Oil and Gas exploration, production and distribution market," the same technology on which Harman and Homa worked while at [Baker Hughes]. . . . Harman and Homa attended the press conference.

(*Id.*, ¶ 49). On September 23, Homa e-mailed many Baker Hughes employees a proposed Memorandum of Understanding between Baker Hughes and FCTech discussing collaboration on fiber-optics sensing technology. (*Id.*, ¶ 50; *see also id.*, Ex. F). Bauer was copied on Homa's e-mail. (*Id.*, ¶ 50). That same day, Baker Hughes sent letters to Homa and Harman reminding each of his "ongoing obligations as a former Baker Hughes employee" not to disclose Baker Hughes's trade secret, confidential, or proprietary information and to return any items containing such information. (*Id.*, Ex. G). After receiving this letter, "Harman told Homa to get rid of the [Baker Hughes] information." (*Id.*, ¶ 57). Homa did so by deleting all of the information on the two electronic-storage devices he had taken with him before he left Baker Hughes. Before Homa deleted the information he had transferred to those devices from the Baker Hughes computers, he reviewed it and copied some to other thumb drives. (*Id.*). The copied files contained Baker Hughes trade secrets pertaining to "manufacturing equipment and process documentation, fiber and cable

13

engineering documentation, pricing, and other R&D documentation." (*Id.*, ¶ 55). E-mails show that some of this information was shared with Bauer and FCTech.

On September 22, Giannis wrote an e-mail to Homa, Harman, Bauer, and Rudolf Halmetschlager, a managing director of FCT and an executive officer of NBG Systems. (Docket Entry No. 99, Ex. 29, at 9, 25). The subject line of this e-mail read: "Christmas present for us all from Dan!!" Giannis reported that "Dan has given me all these information for us to use!" (*Id.*, Ex. 28, at 2). Giannis attached two Excel spreadsheets containing Baker Hughes's confidential pricing information. (*Id.*; *see also id.*, Ex. 30). Giannis joked that "I think we should prepare a nice 'thank you Dan' surprise by calling and telling on him at B.H. for corporate espionage sinc[e], 'no good deed goes unpunished'.., what do you guys think?" (*Id.*, Ex. 28, at 2). Giannis said that he had another file to send, but it was too "big" to attach. Homa responded that Giannis could send the thumb drive—an NBG Systems thumb drive—directly to Halmetschlager. (*Id.*, Ex. 28, at 2; Ex. 31).

Communications continued during the FCTech start-up period. On September 30, Bauer sent an e-mail entitled "R&D in NBG" from his NBG e-mail address. The recipients included Homa, Harman, Giannis, Halmetschlager, and others with NBG e-mail addresses. The e-mail introduced "the new core R&D team in the NBG family" of "our newest investment in US with FCTech Inc. in Virginia[.]" (Docket Entry No. 98, Ex. 18, at 2). The "core team" included Homa. Bauer encouraged the "core team" to coordinate "[s]o decision could be done very quickly and we work over all our sister companies in trust and as a big family!!!" (*Id.*).

On October 16, FCTech, NBG Holding, and Botetourt County, Virginia entered into a "Performance Agreement." The County agreed to provide FCTech with government grants in exchange for the construction of the FCTech facility in the County. Bauer signed the agreement

14

twice, once as President of FCTech, and once as CEO and General Manager of NBG Holding. (*Id.*, Ex. 20, at 6).

Baker Hughes filed this lawsuit against Homa, Harman, FCTech, FCT, and NBG Systems on October 21, 2011, then sought and obtained an ex parte temporary restraining order. (Docket Entry No. 1). The TRO enjoined these five defendants "from disclosing or using, directly or indirectly, BHI's trade secrets, confidential information, and proprietary information concerning optical fiber and fiber-optic technology" and "from altering, destroying, deleting, or otherwise disposing of any hard drives, external-storage devices, electronic documents, or hard-copy documents, including research-and-development lab notebooks and R&D notes, that contain or are derived from BHI's trade secrets, confidential information, and proprietary information concerning optical fiber and fiber-optic technology." The TRO also required the defendants to "return to BHI any hard drives, external-storage devices, electronic documents, or hard-copy documents, that belong to BHI or were obtained or derived from BHI's trade secrets and confidential and proprietary information concerning optical fiber or fiber-optic technology." (Docket Entry No. 6, at 2–3). In response to the TRO, Homa deleted all of the files on the electronic-storage devices that he took from Baker Hughes before he resigned. Homa returned the blank devices to Baker Hughes. (Docket Entry No. 66, ¶ 58). As noted, however, Homa had already transferred the files to two thumb drives. (*Id.*, ¶ 57). Despite the TRO, according to the amended complaint, the

> Defendants provided a quote for downhole optic fiber cables to Houston-based Shell Oil Company, which is [Baker Hughes]'s largest optic fiber cable customer. Defendants gathered information to provide the quote using contacts and information that are [Baker Hughes]'s trade secrets and confidential and proprietary information. Defendants corresponded with the same business contact at Shell that [Baker Hughes] corresponded with to provide quotes for the same

15

>fiber optic cable Harman and Homa quoted while at [Baker Hughes]
>for Shell.

(*Id.*, ¶ 53).

On November 25, this court extended and modified the TRO.  (Docket Entry No. 25).  In addition to the previous restrictions, the court ordered all five defendants to stop work on fiber-optic sensing technology in the downhole environment, to stop design and construction work on the FCTech facility, and to stop efforts to hire current or recent Baker Hughes employees.  (*Id.*, at 2–3).

In December 2011, the court held an evidentiary hearing on Baker Hughes's application for a preliminary injunction.  (Docket Entry Nos. 43–44, 47).  At the close of evidence, the court granted the application, although the relief was not as broad as Baker Hughes sought.  (Docket Entry No. 47).  The restrictions contained in the preliminary injunction were similar to those in the modified TRO.  (*See* Docket Entry No. 53).  Under the preliminary injunction, however, the five defendants were allowed to provide FIMT, so long as the fiber was not designed or manufactured using Baker Hughes's trade secrets.  (*Id.*, at 3–4).

Baker Hughes amended its complaint on January 11, 2012.  (Docket Entry No. 66).  In addition to supplementing the factual allegations, the amended complaint added NBG Holding as a sixth defendant and a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against all defendants.

In March 2012, Baker Hughes settled its claims against Homa and Harman.  The court entered orders dismissing them from the case and permanently enjoining them from certain agreed-upon activities.  (Docket Entry Nos. 94–95).  Also in March 2012, FCTech filed for Chapter 7 bankruptcy.  The claims against FCTech were then severed from this suit and stayed.  (Docket Entry No. 97).  The remaining defendants are the Austrian Defendants: NBG Holding, FCT, and NBG

Systems.  These defendants have moved to dismiss under Federal Rules of Civil Procedure 12(b)(2), 12(b)(4), and 12(b)(5).  (Docket Entry No. 84).  It is unclear from the amended complaint which claims are asserted against these defendants.  In its response to the motion to dismiss, however, Baker Hughes has clarified that it asserts the following claims against the Austrian Defendants: misappropriation of trade secrets (Count I), statutory theft (Count II), tortious interference with contract (Count VI), unjust enrichment (Count VII), and civil conspiracy (Count VIII).  (Docket Entry No. 98, at 11).  The other claims, including the sole federal-law cause of action (under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030), were asserted only against Homa, Harman, and FCTech.

## II.      Personal Jurisdiction

The threshold issue is whether this court can exercise personal jurisdiction over the Austrian Defendants.  If not, their argument that they were insufficiently served is moot.  *Cf. Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 877–79 (7th Cir. 2006) (considering first the existence of personal jurisdiction, and second the sufficiency of service).

### A.      The Applicable Law

When a nonresident defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of demonstrating facts sufficient to support jurisdiction.  *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010).  "At this preliminary stage"—when the court has not held an evidentiary hearing—"the plaintiff need only make a *prima facie* showing of jurisdiction."  *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 496 (5th Cir. 2012).  "In making its determination, the district court may consider the contents of the record before the court at the time of the motion, including affidavits, interrogatories, depositions, oral testimony, or any combination of the

recognized methods of discovery."   *Quick Techs.*, 313 F.3d at 344 (internal quotation marks omitted)).   "[T]he court must accept as true all uncontroverted allegations in the complaint and resolve any factual disputes in favor of the plaintiff."   *ITL Int'l*, 669 F.3d at 496.   But the court is not obligated to credit conclusory allegations, even if uncontroverted.   *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

"A federal district court sitting in diversity may exercise personal jurisdiction over a foreign defendant if (1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the due process guarantees of the United States Constitution."   *Clemens*, 615 F.3d at 378.   This two-step test is the same for federal question cases when the applicable statute is silent on personal jurisdiction.   *See Fiore v. Walden*, 657 F.3d 838, 845 (9th Cir. 2011); *see also Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163–64 (2d Cir. 2010).   When the forum state is Texas, the two steps combine into determining whether exercising personal jurisdiction offends federal due process, "[b]ecause Texas's long-arm statute reaches to the constitutional limits[.]"   *Clemens*, 615 F.3d at 378 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984)).

Under the well-established law on federal due process and personal jurisdiction:

> The Due Process Clause of the Fourteenth Amendment permits a court to exercise personal jurisdiction over a foreign defendant when (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice.

*Id.*   As to the first prong, "[t]here are two types of minimum contacts: contacts that give rise to specific personal jurisdiction and those that give rise to general jurisdiction."   *Id.*   Because Baker

Hughes does not argue that this court can exercise general jurisdiction over the defendants, the issue is whether this court can exercise specific jurisdiction over them. Resolving this issue requires the court to analyze specific jurisdiction claim-by-claim. *See Willow Bend, L.L.C. v. Downtown ABQ Partners, L.L.C.*, 612 F.3d 390, 393 (5th Cir. 2010) ("[S]pecific jurisdiction is bound up with the claim asserted—it is claim-specific.").

"[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tire Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (internal quotation marks omitted). "[I]solated or sporadic contacts" with the forum state may create specific personal jurisdiction, "so long as the plaintiff's claim relates to or arises out of those contacts." *ITL Int'l*, 669 F.3d at 499. "Where the plaintiff alleges specific jurisdiction, as here, due process requires (1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable." *Id.* at 498.

The first prong of the specific-jurisdiction analysis—minimum contacts by the defendant purposefully directed at the forum state—can be subdivided into two overlapping elements. The first element: minimum. "[T]he relevant inquiry . . . is not one of *relative* contacts, but only whether the defendants had sufficient *minimum* contacts with the state." *Id.* at 499 (emphasis in original). This principle led the Fifth Circuit in *ITL International* to reject the defendants' argument that this prong was not satisfied because "much of the relevant activity—perhaps the vast majority of it—had no connection to" the forum state. *Id.* The second element: purposeful. "The 'purposeful availment' element ensures that a defendant will not be haled into court in a jurisdiction solely as

a result of random, fortuitous, or attenuated contacts or the unilateral activity of another person or

third party." *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 369 (5th

Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  These two elements

aside, "[t]he 'minimum contacts' inquiry is fact intensive and no one element is decisive; rather the

touchstone is whether the defendant's conduct shows that it reasonably anticipates being haled into

court."  *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (internal quotation marks omitted).

Such minimum contacts need not occur physically within the forum state for a court in that

state to exercise personal jurisdiction.  Under Fifth Circuit precedent:

> When a nonresident defendant commits a tort within the state, or an
> act outside the state that causes tortious conduct amounts to sufficient
> minimum contacts with the state by the defendant to constitutionally
> permit courts within that state, including federal courts, to exercise
> personal jurisdiction over the tortfeasor.  Additionally, even an act
> done outside the state that has consequences or effects within the
> state will suffice as a basis for jurisdiction in a suit arising from those
> consequences if the effects are seriously harmful and were intended
> or highly likely to follow from the nonresident defendant's conduct.

*Id.* at 761 (internal quotation marks, footnotes, and alterations omitted).

The second prong of the specific-jurisdiction analysis focuses on the nexus between the

defendant's minimum contacts and the plaintiff's claims.  "[I]n addition to minimum contacts,

specific jurisdiction only obtains when a plaintiff's claims 'arise out of or relate to' the defendant's

purposeful contacts with the forum."  *ITL Int'l*, 669 F.3d at 500 (quoting *Burger King*, 471 U.S. at

472 & n.15).

After the plaintiff establishes minimum contacts and the nexus between those contacts and

the claims, the burden shifts to the nonresident defendant to show that asserting jurisdiction is fair

and reasonable.  *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 245 (5th

Cir. 2008). The defendant must "ma[k]e a 'compelling case[]' that assertion of personal jurisdiction would offend traditional notions of fair play and substantial justice." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 402 (5th Cir. 2009) (quoting *Burger King*, 471 U.S. at 477). "In conducting the fairness inquiry, [courts] examine (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006).

### B.   Jurisdictional Discovery

A court may grant jurisdictional discovery when the plaintiff makes a preliminary showing of jurisdiction. *See Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005) (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)). A preliminary showing is less than a prima facie showing; if the plaintiff made a prima facie showing, jurisdictional discovery would be unnecessary. When the lack of personal jurisdiction is clear, discovery is also unnecessary. *Kelly v. Syria Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (internal quotation marks omitted). The Fifth Circuit "affirms denials of discovery on questions of personal jurisdiction in cases where discovery sought could not have added any significant facts." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir. 2000) (internal quotation marks omitted). "If the plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between the party and the forum state, the plaintiff's right to conduct jurisdictional discovery should be sustained." *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 157 (3d Cir. 2010) (internal quotation marks and alterations omitted); *see also Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1235 (Fed. Cir. 2010)

(explaining that, in the Ninth Circuit, jurisdictional "discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary" (internal quotation marks omitted)).

After careful consideration of the record, this court concludes that Baker Hughes has made a preliminary—but not a prima facie—showing of personal jurisdiction. At the outset, the court notes that much of the Austrian Defendants' opposition to the arguments that this court can exercise personal jurisdiction relies on a point-by-point denial of Baker Hughes's factual assertions. (*See* Docket Entry No. 101, at 2–5). At this stage of the analysis, however, this court "must accept as true all uncontroverted allegations in the complaint and must resolve any factual disputes in favor of the plaintiff." *ITL Int'l*, 669 F.3d at 496.[4] To the extent that the Austrian Defendants disagree with the facts Baker Hughes asserts, and to the extent that the Austrian Defendants have presented controverting evidence, this court must resolve any factual dispute in Baker Hughes's favor.[5]

Under the applicable law, Baker Hughes has presented sufficient factual allegations, supported by record evidence, for this court to find the possible existence of minimum contacts between the defendants and Texas. *See Eurofins Pharma US Holdings*, 623 F.3d at 157. But the record is not sufficient to make a prima facie showing of the elements of specific personal jurisdiction as to each of the Austrian Defendants on each cause of action. Jurisdictional discovery will add significant facts necessary for this court accurately to determine whether each remaining

---

[4]Further, none of Baker Hughes's factual allegations are conclusory. *See Panda Brandywine*, 253 F.3d at 869 (explaining that, in resolving a motion to dismiss for lack of personal jurisdiction, a court need not credit a plaintiff's conclusory allegations).

[5]"Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at a trial." *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 326 (5th Cir. 1996) (internal quotation marks omitted); *see also Walk Haydel*, 517 F.3d at 241 ("Ultimately, the plaintiff must show by a preponderance of the evidence that jurisdiction is proper.").

defendant—NBG Holding, FCT, and NBG Systems—had the requisite minimum contacts with Texas, and whether those contacts have a nexus to each claim alleged by Baker Hughes. Neither Baker Hughes's amended complaint nor its opposition to the motion to dismiss differentiate among the three. Baker Hughes has not expressly relied on an alter-ego theory and has asserted no basis to attribute the contacts of one entity to another entity. Targeted jurisdictional discovery is necessary to determine which defendant (or defendants)—NBG Holding, FCT, or NBG Systems—took the actions that are asserted as the basis for specific personal jurisdiction.

Many of the contacts alleged by Baker Hughes appear to rest on actions taken by Karl Bauer. As previously discussed, Bauer serves as a managing director for NBG Holding, FCT, and NBG Systems. (Docket Entry No. 84, Ex. A, ¶ 2). He also served as the sole managing director of FCTech during that company's brief existence. (Docket Entry No. 66, Ex. D). Additionally, for NBG Holding, Bauer is one of four owners, (Docket Entry No. 84, Ex. A, ¶ 7), and identifies himself as its CEO, (*e.g.*, Docket Entry No. 98, Ex. 11, at 2 (Bauer's e-mail signature block)). For FCT, Bauer identifies himself as its CEO. (Docket Entry No. 66, Ex. C, at 4). For FCTech, Bauer identified himself as its CEO. (*Id.*, Ex. E). There are significant factual questions about which defendant Bauer was acting on behalf of when he took the actions giving rise to the alleged Texas contacts. Discovery on these questions is necessary.

Other alleged Texas contacts appear to rest on actions taken by Andreas Giannis. The record is unclear as to Giannis's role with the Austrian Defendants. Homa identified Giannis as NBG Systems's "US & CA Director of Sales" for NBG Systems, (Docket Entry No. 98, Ex. 1, at 1), while Bauer identified Giannis as NBG Systems's "Area Sales Manager," (*id.*, Ex. 5). The record—which includes numerous e-mail exchanges among Giannis, Bauer, Homa, and Harman, and in which

Giannis used an NBG e-mail address—further suggests that Giannis was highly involved in the formation of FCTech.  Targeted jurisdictional discovery is necessary to determine Giannis's formal role with each of the Austrian Defendants and in what capacity Giannis was acting in making his alleged contacts with Texas.

One of the contacts Baker Hughes alleges was the defendants' failed recruitment of Douglas Norton, a Houston-based Senior Technical Advisor.  The circumstances surrounding Norton's recruitment—for example, who initiated it, the specific steps that were taken, and the timing—are unclear.  One such circumstance is Bauer's communications with Norton.  According to Bauer, those communications were in his capacity as FCTech's CEO and director.  (Docket Entry No. 84, Ex. A, ¶ 8).  Depending on the timing of those communications, however, FCTech may not have yet been established.  Targeted jurisdictional discovery into these circumstances and communications will provide a helpful and necessary addition to the record.

Jurisdictional discovery on these topics must be completed by **June 25, 2012**.  If the parties believe that jurisdictional discovery on topics not listed above is necessary and cannot agree on that additional discovery, they may ask the court for leave to do so and ask for a premotion conference on that question.

After the deadline for the jurisdictional discovery, the Austrian Defendants may file an amended motion to dismiss expanded to include the results of the discovery.  The brief in support of the amended motion must specifically address, among other issues, the legal effect of allegedly tortious acts directed toward out-of-state employees of a Texas-based company and whether alleged misappropriation of information stored on a company's computer servers in Texas are sufficient for this Texas court to assert specific personal jurisdiction.  The Austrian Defendants must file this

amended motion by **July 9, 2012**.  Baker Hughes must respond by **July 23**.  The Austrian

Defendants may reply by **July 30**.  Oral argument on the motion will be held during a status

conference on **August 3**, at 10:00 a.m.

### III.    Insufficient Service of Process

The next issue is whether the Austrian Defendants were properly served.[6]  Baker Hughes

attempted to serve FCT and NBG Systems through the Texas Secretary of State.  The Austrian

Defendants argue that such service is insufficient under Rule 4(f).  (Docket Entry No. 84, at 18–19).

Baker Hughes responds that service through the Texas Secretary of State complies with the Texas

Civil Practice and Remedies Code, and therefore is sufficient service under Rule 4(e)(1).  (Docket

Entry No. 98, at 18–19).  As for NBG Holding, the Austrian Defendants argue that Baker Hughes

has made no attempt at service.  (Docket Entry No. 84, at 18 n.2).  Baker Hughes responds that it

asked NBG Holding to waive service, without success.  "Now that the waiver period has passed,

Baker Hughes plans to initiate service against NBG Holding."  (Docket Entry No. 98, at 21).  Citing

Rule 4(f)(3), Baker Hughes asks this court to allow service through NBG Holding's counsel or by

e-mail to Karl Bauer.  (*Id.*).

"A motion to dismiss pursuant to Rule 12(b)(5) turns on the legal sufficiency of the service

of process."  *Holly v. Metro. Transit Auth.*, 213 F. App'x 343, 344 (5th Cir. 2007) (per curiam).

Rule 4(h) outlines how to effect service on foreign corporations, such as the Austrian Defendants.

---

[6]In addition to asserting insufficient service of process under Rule 12(b)(5) as a ground for dismissal, the defendants also assert insufficient process under Rule 12(b)(4).  (Docket Entry No. 84, at 17).  "Generally speaking, '[a]n objection under Rule 12(b)(4) concerns the form of the process rather than the manner or method of its service,' while a 'Rule 12(b)(5) motion challenges the mode of delivery or the lack of the delivery of the summons and complaint.'"  *Gartin v. Par Pharm. Cos.*, 289 F. App'x 688, 691 n.3 (5th Cir. 2008) (per curiam) (quoting 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1353 (3d ed. 2008)).  The defendants have made no argument concerning the insufficiency of the form of the process.  Instead, their objections solely relate to the method of service.  The defendants' objection, therefore, sounds in Rule 12(b)(5) alone.

A foreign corporation can be served in a United States judicial district "in the manner prescribed by Rule 4(e)(1) for serving an individual[.]" FED. R. CIV. P. 4(h)(1)(A).  A foreign corporation can be served outside of the United States "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."  FED. R. CIV. P. 4(h)(2).

FCT and NBG Systems were served in Texas through the Texas Secretary of State.  (Docket Entry No. 98, Exs. 25–26). Rule 4(e)(1) applies.  *See* FED. R. CIV. P. 4(h)(1)(A).  This rule allows service on a foreign corporation by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made[.]" FED. R. CIV. P. 4(e)(1).  Texas law allows substituted service on the Texas Secretary of State:

> The secretary of state is an agent for service of process on a nonresident who engages in business in this state, but does not maintain a regular place of business in this state or a designated agent for service of process, in any proceeding *that arises out of the business done in this state* and to which the nonresident is a party.

TEX. CIV. PRAC. & REM. CODE § 17.044(b) (emphasis added).  Texas law provides a nonexhaustive list of three circumstances in which a nonresident engages in business in Texas:

> (1) [The nonresident] contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
>
> (2) [the nonresident] commits a tort in whole or in part in this state; or
>
> (3) [the nonresident] recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

*Id.* § 17.042.  If FCT and NBG Systems engaged in business in Texas, and Baker Hughes's lawsuit against them arises out of that business, then Texas law entitles Baker Hughes to serve them in

26

Texas through the Texas Secretary of State, regardless of whether they "appointed any agent in the United States to receive service of process in civil lawsuits" or "consented to receive service of process in the United States." (Docket Entry No. 101, at 1).

Baker Hughes asserts that FCT and NBG Systems have engaged in business in Texas under all three circumstances described in § 17.042. (Docket Entry No. 98, at 19). The current record, however, is unclear. FCT and NBG Systems entered into numerous contracts in the form of purchase orders throughout 2010 and 2011. Those contracts stated that performance was deemed to have occurred in Texas. (Docket Entry No. 98, Ex. 8, at 9). But the causes of action asserted by Baker Hughes in this lawsuit do not arise out of the performance of those contracts. Rather, the causes of action arise out of the Austrian Defendants' alleged activities unrelated to the purchase orders: the successful recruitment of Homa and Harman to FCTech; the failed recruitment of Horton to FCTech; and the encouragement of Homa and Harman to violate their legal duties to Baker Hughes to form FCTech and help it compete with Baker Hughes. For the reasons outlined above in the minimum-contacts analysis, it is unclear whether all three defendants committed these torts, which of the defendants Bauer was acting on behalf of, which of the defendants Giannis was acting on behalf of, and what circumstances surrounded the effort to recruit Norton. Targeted discovery on these issues is needed to determine whether service on FCT and NBG Systems through the Texas Secretary of State was proper. The motion to dismiss for improper service of process as to FCT and NBG Systems is denied, but without prejudice. It may be reurged on the same schedule, and through the same procedure, that is outlined above.

As to NBG Holding, the parent company, Baker Hughes has conceded that it has not effected service. Baker Hughes asks this court to allow service on NBG Holding under Rule 4(f)(3) by mail

to NBG Holding's counsel or by e-mail to Bauer.  (Docket Entry No. 98, at 21).  Because Baker

Hughes must serve NBG Holding outside the United States,[7] Rule 4(f) applies.  *See* FED. R. CIV. P.

4(h)(2).  Under that rule, a foreign corporation can be served outside of the United States

> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>
> (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
>
>> (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
>>
>> (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
>>
>> (C) unless prohibited by the foreign country's law, by:
>>
>>> (i) delivering a copy of the summons and of the complaint to the individual personally; or
>>>
>>> (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or
>
> (3) by other means not prohibited by international agreement, as the court orders.

FED. R. CIV. P. 4(f).

---

[7] Although Baker Hughes asserts that it "believes that NBG Holding could be properly served through the Texas Secretary of State for the same reasons as the other Austrian Defendants," Baker Hughes has not attempted such service. (Docket Entry No. 98, at 21).  Had it done so, on the current record, jurisdictional discovery would be necessary to determine to what extent NBG Holding specifically had engaged in business in Texas for the reasons previously discussed.

Rule 4(f)(1) is inapplicable because Austria is not a signatory to the Hague Convention.  *See In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, No. 1428 (SAS), 01 Civ. 7342, 2003 WL 1807148, at *7 n.15 (S.D.N.Y. Apr. 4, 2003).  Austria prohibits "the direct service of foreign legal documents by foreign authorities or by private individuals without the assistance or consent of Austrian authorities," regarding such direct service "as an infringement of Austria's sovereignty." *Id.* (citing 1/7/03 Note Verbale to the U.S. Embassy).  Instead, "[s]ervice of foreign legal documents must be 'effected by letters rogatory through diplomatic channels, . . . and in the manner prescribed by Austrian law for the service of such documents.'"  *Id.* (quoting Note Verbale).  Austrian law additionally requires foreign documents to be accompanied by a certified German translation, unless the Austrian party accepts the documents without the translation.  *Id.* (citing Note Verbale).

Baker Hughes responds that it "is unaware of any international agreement between Austria and the United States that prohibits service through counsel or via email."  (Docket Entry No. 98, at 21).  The Austrian Defendants, in their reply, did not point to any international agreement prohibiting such service.  The Austrian Defendants instead argued that "[i]n order to properly serve an Austrian company with service of process you must do so through the use of Letters Rogatory and then have the Letters Rogatory and the underlying pleadings translated and then served in Austria."  (Docket Entry No. 101, at 2).  That would be true if Baker Hughes attempted to serve the defendants through Rule 4(f)(2); however, Baker Hughes seeks leave to serve the defendants through Rule 4(f)(3).  "The only proscription on the district court's discretion" to order service under Rule 4(f)(3) "is that the method not be prohibited by international agreement."  4B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1134 (3d ed. 2008).  A Ninth Circuit opinion summarizes the rule, as follows:

> As obvious from its plain language, service under Rule 4(f)(3) must be (1) directed by the court; and (2) not prohibited by international agreement. No other limitations are evident from the text. In fact, as long as court-directed and not prohibited by an international agreement, service of process ordered under Rule 4(f)(3) may be accomplished *in contravention of the laws of the foreign country*.

*Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1014 (9th Cir. 2002) (emphasis added). A plaintiff need not first seek to serve a foreign defendant under Rule 4(f)(2) before turning to Rule 4(f)(3); service under either subsection is acceptable. *See id.* at 1014–15; *Forum Fin. Grp., LLC v. President, Fellows of Harvard College*, 199 F.R.D. 22, 23 (D. Me. 2001). "The use of a court-directed means for service of process under Rule 4(f)(3) is not a disfavored process and should not be considered extraordinary relief." 4B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1134 (2011 supp.).

At the same time, the Committee Note to Rule 4 states that "[i]nasmuch as our Constitution requires that reasonable notice be given, an earnest effort should be made to devise a method that is consistent with due process *and minimizes offense to foreign law*." FED. R. CIV. P. 4(f) Committee Note (1993) (emphasis added). Authorizing service either way Baker Hughes requests—by mail to NBG Holding's counsel, or by e-mail to Bauer—directly contravenes Austrian law and would therefore offend foreign law. Although the court could order such service under Rule 4(f)(3),[8] Baker Hughes has not explained why "the facts and circumstances of the present case necessitate[] the district court's intervention." *Rio Props.*, 284 F.3d at 1016. Baker Hughes's only reasons for

---

[8]In *Ski Train Fire*, the court concluded that it could not order service by direct mail on an Austrian defendant under Rule 4(f)(3) because Rule 4(f)(3) requires "any such service [to] comport with the laws of the foreign country." 2003 WL 1807148, at *7. For this proposition, however, the court quoted in part a section of the Committee Note that applied to Rule 4(f)(2). According to the Note, "Service by methods that would violate foreign law is not generally authorized." *Id.* (quoting FED. R. CIV. P. 4(f) advisory committee notes (1993)). Rule 4(f)(2) contains the clear proscription on service that violates the foreign country's law. Rule 4(f)(3), instead, merely proscribes service that violates an international agreement, as previously discussed. The Committee Note clarifies that the court should be cognizant of minimizing offense to foreign law.

seeking alternative service under Rule 4(f)(3) are "to expedite the process and avoid additional costs of service." (Docket Entry No. 98, at 21). Though these are legitimate reasons and can be sufficient justification, this court cannot conclude on the current record that service in a manner that greatly offends Austrian law is appropriate. Instead, this court will extend the time to serve NBG Holding to the deadline for conducting jurisdictional discovery. If NBG Holding has not been properly served by the end of the jurisdictional-discovery period, the Austrian Defendants may reurge the motion to dismiss for insufficient service of process, as discussed above.

## IV.    Conclusion

The defendants' motion to dismiss for lack of personal jurisdiction and for insufficient service of process, (Docket Entry No. 84), is denied. As explained above in detail, however, this dismissal is without prejudice to reassertion after the jurisdictional discovery. That targeted discovery must be completed by **June 25, 2012**. The Austrian Defendants, assuming they wish to do so, must file an amended motion to dismiss for lack of personal jurisdiction and for insufficient service of process by **July 9**. Baker Hughes must respond by **July 23**. The Austrian Defendants may reply by **July 30**.

A status conference, to include oral argument on the motion, is scheduled for **August 3, 2012** at 10:00 a.m. in Courtroom 11-B.

SIGNED on April 30, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

31