**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

BAKER HUGHES INCORPORATED, §
*et al.*, §
§
Plaintiffs, §
§
VS. § CIVIL ACTION NO. H-11-3757
§
DANIEL S. HOMA, *et al*., §
§
Defendants. §

**MEMORANDUM AND ORDER**

Baker Hughes Incorporated and Baker Hughes Oilfield Operations, Inc. (together, "Baker

Hughes") sued two former employees, Daniel S. Homa and Robert W. Harman; their new employer,

FCTech, Inc.; and FCTech's affiliated companies, FCT Fiber Cable Technology GmbH ("FCT"),

NBG Systems GmbH, and NBG Holding GmbH. (Docket Entry No. 66). Baker Hughes settled its

claims against Homa and Harman, and they were dismissed from this lawsuit. (Docket Entry Nos.

94–95). The claims against FCTech have been severed and stayed based on its bankruptcy filing.

(Docket Entry No. 97). The remaining defendants are NBG Holding and its subsidiaries, FCT and

NBG Systems, all Austrian companies, (together, the "Austrian Defendants"), and Andreas Giannis,

a consultant for the Austrian Defendants.

Following hard work on jurisdictional discovery by Baker Hughes, the Austrian Defendants

reurged their motion to dismiss for lack of personal jurisdiction and for insufficient service of

process. (Docket Entry Nos. 127, 143). Baker Hughes responded, (Docket Entry No. 146), the

Austrian Defendants replied, (Docket Entry No. 147), and Baker Hughes surreplied, (Docket Entry

No. 148). The court heard argument on the motion to dismiss and ordered each party to submit an

additional brief explaining their primary factual and legal positions in light of the present record. (Docket Entry No. 181).  Baker Hughes filed its supplemental brief in support of jurisdiction, (Docket Entry No. 182), and the Austrian Defendants responded, (Docket Entry No. 183).

Based on a careful review of the motions, responses, and replies; the parties' submissions; and the applicable law; this court grants the Austrian Defendants' motion to dismiss for lack of personal jurisdiction.  By **October 30, 2013**, the parties are to file a statement identifying any issues that remain to be resolved, or, if no issues remain, a proposed form of order dismissing the case.

The reasons for this ruling are explained below.

## I.    Background[1] and Procedural History

Baker Hughes, Inc., is a Delaware corporation and Baker Hughes Oilfield Operations, Inc. is a California corporation.  (Docket Entry No. 125 at ¶¶ 1–2).  Both have their principal place of business in Houston.  Baker Hughes is an oil-field service company.  "One of [its] primary goals is to provide technological solutions to the oil and gas industry for the safer and more efficient production of hydrocarbons."  (*Id.* at ¶ 14).  One source of such solutions is in fiber-optic sensing technology.  (*Id.*).  Although Baker Hughes directs the research and development of that technology from its Houston headquarters, its research and development facility for the technology is in Blacksburg, Virginia.  Baker Hughes also manufactures optical fiber and fiber-optic equipment in the Virginia facility.  (*Id.* at  ¶ 29).

"CoreBright" is one of the fibers that Baker Hughes researched, developed, and manufactured at the Virginia facility.  Developing CoreBright took Baker Hughes "many years of

---

[1]    The factual summary comes from the first amended complaint, the second amended complaint, the attachments to those complaints, and other exhibits in the record.  *See Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 344 (5th Cir. 2002) (explaining that a district court "may consider the contents of the record before the court at the time of the motion" in deciding a motion to dismiss for lack of personal jurisdiction).

research and tens of millions of dollars in financial investment." (*Id.* at ¶ 21).  Baker Hughes owns patents on CoreBright and the method for manufacturing it.  (*Id.*).  Baker Hughes alleges that because of the uniqueness of CoreBright and other fiber-optic sensing technology that it has developed, the trade secrets and confidential and proprietary related to that technology are "highly valuable." (*Id.* at ¶ 28).[2]  Baker Hughes alleges that it "takes precautions"—restricting access to its research and development facility and to the computer server containing research and development, and requiring employees to sign an agreement restricting the disclosure and use of its trade secrets protect against unauthorized disclosure.  (*Id.* at ¶ 27).

Baker Hughes hired Daniel Homa, a Virginia resident, in October 2004.  (Id. at  30).  Homa served as an engineer at Baker Hughes's Virginia facility.  According to the complaint, Homa

> had worked for [Baker Hughes], or a [Baker Hughes] predecessor, for more than ten years and was integrally involved in [Baker Hughes's] fiber optic research and development.  Homa is the named inventor on seven issued [Baker Hughes] patents and numerous pending and soon to be pending [Baker Hughes] patent applications.  While working for [Baker Hughes], Homa was involved in all areas of optical fiber design, development and manufacture and was thus exposed to virtually all of [Baker Hughes's] trade secrets and confidential and proprietary information regarding [Baker Hughes's] fiber optic technology, including [Baker Hughes's] proprietary CoreBright™ technology.

(*Id.*).

Baker Hughes hired Robert Harman, a Virginia resident, in May 2008.  (*Id.* at 31).  Harman served as the Engineering/Plant Manager of the Virginia facility, which placed him in charge of the facility's operations.  According to the complaint, "Harman was exposed not only to [Baker

---

[2] For ease, the court refers to "trade secrets and confidential and proprietary information" simply as "trade secrets" or "protected information."

Hughes's] fiber optic technology but also to all of [Baker Hughes's] future business plans, business relationships, including with [Baker Hughes's] customers and vendors, price lists, business strategies, and business opportunities in fiber optics." (*Id.* at ¶ 31).

Baker Hughes alleged that Homa and Harman's responsibilities required their constant interaction with the Baker Hughes headquarters in Houston. In particular, Homa and Harman "reported to and received directions, particularly in the research and development of fiber optics technology, from their supervisors located at [Baker Hughes's] headquarters in Houston, Texas." (*Id.* at ¶ 32). Additionally, they traveled to Houston to attend meetings with their supervisors. "The objectives of these meetings were to further the development of [Baker Hughes's] trade secrets and confidential and proprietary information related to its fiber optic technology . . . ." (*Id.*).

In mid-2010, Homa and Harman initiated a business relationship for Baker Hughes with NBG Holding GmbH, FCT Fiber Cable Technology GmbH ("FCT"), and NBG Systems GmbH—the Austrian Defendants. (*Id.* at ¶ 40). The record shows the following information about these defendants:

- NBG Holding is an Austrian company. Its subsidiaries, with the exception of FCTech, Inc., are companies formed under the laws of Austria or other foreign countries. NBG Holding has only one office, located in Austria. NBG Holding neither markets nor produces goods or services. Aside from hiring a Virginia attorney to assist with forming FCTech, NBG Holding has never "utilized any vendor or supplier" or entered into any contract or business agreement with any person or entity in the United States.

- Karl Bauer is one of NBG Holding's four owners. (*Id.*, Ex. A at ¶ 7). He also serves as NBG Holding's CEO and as one of its managing directors. (*Id.* at ¶ 2; *see also, e.g.*, Docket Entry No. 98, Ex. 11 at 2 (Bauer's e-mail signature block)).

- FCT is a subsidiary of NBG Holding. NBG Holding owns 80% of FCT's shares, and another Austrian corporation owns the remaining 20%. FCT's only office is located in Austria, where it conducts all of its business. "FCT manufactures fiber in metal tubing ('FIMT') products for sale in geographic markets outside Austria." (Docket

Entry No. 84, Ex. A at ¶ 5).  Bauer serves as a managing director of FCT.  (*Id.*, Ex. A at ¶ 2).  Bauer has also identified himself in documents as the CEO of FCT. (Docket Entry No. 125, Ex. C at 4).

- NBG Systems is a subsidiary of NBG Holding.  NBG Holding owns 95% of NBG Systems's shares; an Austrian NBG Holding executive owns the remaining 5%. NBG Systems's principal place of business is in Austria.  It has no offices in the United States.  "NBG [Systems] has a business relationship with FCT to market FCT's FIMT products in geographic markets outside Austria."  (Docket Entry No. 84, Ex. A, ¶ 6).  Bauer serves as a managing director of NBG Systems.  (*Id.*, Ex. A, ¶ 2).

In mid-2010, Homa and Harman contacted FCT "to explore the possibility of FCT making FIMT" for Baker Hughes's CoreBright fiber.  (Docket Entry No. 84, Ex. A, ¶ 10; *see also* Docket Entry No. 125 at ¶ 40).  On June 7, 2010, Homa e-mailed another Baker Hughes employee to have FCT set up as a vendor in Baker Hughes's computer system.  Homa listed Andreas Giannis, "US & CA Director of Sales" for NBG Systems as the contact with FCT and included Giannis's NBG e-mail address.  (Docket Entry No. 98, Ex. 1 at 1).

On June 15, 2010, Baker Hughes Oilfield Operations and FCT entered into a nondisclosure agreement "to review and evaluate the possibility of entering into a business arrangement" in which FCT would provide FIMT to Baker Hughes "for its use in the oil and gas industry." (Docket Entry No. 125, Ex. C at 1).  The agreement required Baker Hughes Oilfield Operations and FCT to exchange confidential and proprietary information and had a six-month term.  (*Id.* at 1–3).  A vice-president signed the agreement on behalf of Baker Hughes, and Bauer signed the agreement as CEO of FCT.  (*Id.* at 4).

Communications continued between Baker Hughes and FCT.  To set FCT up as a vendor, a Baker Hughes employee e-mailed two forms to Giannis, who filled them out and signed them on behalf of NBG Systems.  To complete the vendor registration, an NBG Holding employee e-mailed

a "company report" to Baker Hughes, although it is unclear which company report was sent. (Docket Entry No. 98, Ex. 3). On June 22, Bauer completed Baker Hughes's "Direct Deposit Authorization" form. Bauer listed "NBG Systems" as the legal name of the business. Bauer listed Giannis as the company's contact, identifying his position as Area Sales Manager. Bauer signed the form, above an NBG Systems business stamp, as "Managing Director." (*Id.*, Ex. 5).

In September 2010, a team from FCT visited Baker Hughes's Virginia facility. Representing FCT were Bauer, Giannis, and a third person; representing Baker Hughes were Homa, Harman, Doug Norton—a Houston-based Senior Technical Advisor for fiber-optics sensing, (*id.*, Ex. 16, ¶¶ 1–2)—and a fourth Baker Hughes employee. (*Id.*, Ex. 7 at 113).

The nondisclosure agreement expired in December 2010. After that date, Homa and Harman "continued to meet with FCT and to work with FCT to develop FIMT incorporating [Baker Hughes's] fiber, even though the NDA was not renewed and FCT was not required to sign a Joint Development Agreement." (Docket Entry No. 125 at ¶ 42). According to Baker Hughes, for FCT to continue working for Baker Hughes, Harman as Engineering Manager was responsible for having FCT either renew the nondisclosure agreement or sign a Joint Development Agreement. (*Id.*).

Throughout 2010 and 2011, Baker Hughes signed numerous purchase orders to obtain FIMT. (Docket Entry No. 98, Ex. 8). The purchase orders listed both FCT and NBG Systems under the vendor name. The orders also stated that "[t]he rights, duties and obligations described herein arose and are performed in Harris County, Texas." (*E.g.*, *id.*, Ex. 8 at 9). The purchase orders stated that FCT or NBG Systems were to ship the finished FIMT product to the Baker Hughes Virginia facility or to Baker Hughes's facilities in Connecticut or North Carolina. Invoices were to be sent to a Baker Hughes P.O. Box in Portland, Oregon. (*E.g.*, *id.*, Ex. 8 at 3, 15, 55). Return invoices from

FCT or NBG Systems came on NBG Systems letterhead.  (*E.g.*, *id.*, Ex. 8 at 1).  Some documents also came on FCT letterhead.  (*E.g.*, *id.*, Ex. 8 at 49).  For FCT or NBG Systems to fill these purchase orders, Homa and Harman would have to disclose some Baker Hughes trade secrets, despite the absence of a nondisclosure or joint-development agreement.  (*See* Docket Entry No. 125, ¶¶ 42–43).

"As of mid-2011, [the Austrian Defendants] had not been in the business of developing or manufacturing optical fibers or downhole fiber optic cables.  [The Austrian Defendants were] in the business of manufacturing the FIMT that protects the optical fibers."  (*Id.* at ¶ 44).  According to a document entitled "NBG company evolution" that Bauer wrote in 2010, some or all of the defendants—the document refers only to "we"—decided to expand NBG's focus from manufacturing FIMT to providing fiber-optic sensing technology similar to the technology Baker Hughes provided.  (Docket Entry No. 98, Ex. 9 at 2).  In 2011, some or all of the defendants decided to target the U.S. market to sell fiber-optic sensing technology for use in the fields of oil and gas, national defense, and medicine.  (*Id.*).

The planning for this expansion allegedly began in March 2011, during a trip to Austria by Homa and Harman to meet with FCT about a Baker Hughes purchase order.  The idea to form a fiber-optics cable business emerged during a dinner attended by Homa, Harman, Bauer, Giannis, and perhaps one other person.  (Docket Entry No. 98, Ex. 12 at 113–14).  Harman was uncertain who had the idea.  (*Id.* at 114–15).  Throughout April 2011, Homa, Harman, Bauer, and Giannis exchanged numerous e-mails planning their business in the United States.  (*See id.*, Exs. 13–14).  These e-mails discussed Giannis's plans to attend the May 2011 Offshore Technology Conference in Houston, where all four could meet and talk more about the planned business.  Giannis suggested

to Bauer that they combine the Houston trip with a visit to Virginia, where the business would be established.  According to Giannis, Doug Norton "will be there and I would like Karl [Bauer] to participate on these talks between us," apparently a reference to recruiting Norton to the new business.  (*Id.*, Ex. 13 at 1).  Giannis, however, denies attending the Houston Offshore Technology Conference.  (Docket Entry No. 101, Ex. B at ¶ 23).  On April 20, Bauer e-mailed Homa, Harman, and Giannis to "express my intention to work together with you as a team" to create the new company, which Bauer called "the NewCo."  (Docket Entry No. 98, Ex. 14 at 1).  The core team, according to Bauer, would be Homa, Harman, and Giannis.  Bauer envisioned Giannis as NewCo's leader, with Harman bringing his knowledge of the oil-and-gas market and Homa bringing his knowledge of the "technical developments we need."  (*Id.*).  Bauer suggested "that during our meeting in Roanoke [Virginia] we will finalize all open points [about NewCo], take our common decissions [sic] and fix all our follow ups."  (*Id.*).

Homa, Harman, Bauer, and Giannis met in Roanoke from May 5 to 7, 2011.  Over these three days,  the group appears to have discussed many details about establishing NewCo.  (*See generally* Docket Entry No. 98, Ex. 15).  Ken Ferris, a Virginia businessman, attended some of the meetings According to Harman, Ferris would be able to set up meetings with local government business-development representatives about establishing NewCo in the Roanoke Valley.  (*See id.*, Ex. 13 at 1).  Handwritten notes suggest that meetings with local government representatives, and perhaps  business leaders, occurred.  (*See generally id.*, Ex. 15).

On May 12, Ferris e-mailed Bauer and Harman, as well as another person, to follow up on the meeting.  Ferris listed fifteen "action items" that the group needed to work on to establish NewCo.  Many of these items required "NBG" to take action, although whether this refers to NBG

Holding or NBG Systems is unclear.  (*Id.*, Ex. 11 at 1).  The group continued exchanging e-mails over the next ten days, eventually including Homa and Giannis on the e-mail thread.  In some of the e-mails, Giannis and Ferris discussed the possibility of recruiting employees from Baker Hughes's Virginia facility.  (*Id.*, Ex. 11 at 4–5).

In June 2011, Homa and Harman asked Baker Hughes for copies of their employment agreements.  According to the second amended complaint, at the same time, they began negotiating the terms for their employment as "executives, officers, and part-owners of [the Austrian defendants'] newly-formed U.S. subsidiary, FCTech."  (Docket Entry No. 125 at ¶ 46).  On July 1, FCTech, Inc. was incorporated under Virginia law.  (*Id.*, Ex. D at 7).  Bauer was FCTech's only director.  (*Id.*, Ex. D at 2).  Homa's title at FCTech was Vice-President of Technology; Harman's title was Vice-President of Operations.  (*Id.* at ¶ 46).

Sometime beginning in mid-2011, before Homa and Harman left Baker Hughes, they, along with Bauer, allegedly tried to recruit Doug Norton to leave Baker Hughes and join FCTech.  Norton, a Houston resident, worked as a Senior Technical Advisor in fiber-optics sensing for Baker Hughes.  (*Id.* at ¶ 62; Docket Entry No. 98, Ex. 16 at ¶¶ 1–2).  According to Norton, "Rob Harman and Dan Homa told me that someone from FCT would be calling me to discuss an employment opportunity with FCT."  (Docket Entry No. 98, Ex. 16 at ¶ 4; *see also* Docket Entry No. 125 at ¶ 62).  Homa and Harman discussed the FCTech job as "a good opportunity."  (Docket Entry No. 98, Ex. 16 at ¶ 4).  Bauer "called and emailed Mr. Norton, at [Baker Hughes's] Houston facility, to discuss the job opportunity with [the defendants]."  (Docket Entry No. 125 at ¶ 62; *see also* Docket Entry No. 98, Ex. 16 at ¶ 4).  Bauer admits contacting Norton but claims that he did so "on behalf of FCTech, Inc. and in my capacity as a director and CEO of FCTech, Inc."  (Docket Entry No. 84, Ex. A at ¶ 8).

E-mails show that in September 2011, Norton planned a trip to Roanoke to visit with Homa, Harman, and Giannis about joining FCTech.  (*See* Docket Entry No. 98, Ex. 17).  Giannis used his NBG e-mail address and copied Bauer using his NBG e-mail address.  A member of NBG Holding's "Management Assistance" group contacted Norton to let him know that she was "responsible" for planning his trip to Roanoke.  (*Id.*, Ex. 17 at 1).  According to Bauer, no job offer was ever extended to Norton.  (Docket Entry No. 84, Ex. A at ¶ 8).

While still employees of Baker Hughes, Homa and Harman used vacation time to travel internationally "on behalf of FCTech to purchase a lathe and draw tower for manufacturing optical fiber."  (Docket Entry No. 125 at ¶ 48).  According to the complaint, Homa and Harman offered employment at FCTech to a Baker Hughes lathe operator, to begin as soon as FCTech's lathe and draw tower became operational.  (*Id.* at ¶ 63).

On September 1, Homa and Harman gave two weeks' notice of their resignation from Baker Hughes.  (*Id.* at ¶ 49).  During the two weeks (and possibly before), Homa copied Baker Hughes information—some of which was allegedly stored on Baker Hughes's computer servers in Houston—onto two electronic-storage devices.  These devices "contained substantially everything that existed on Homa's [Baker Hughes] computer, trade secrets and confidential and proprietary information that were stored on [Baker Hughes's] Houston servers, and basically anything he had worked on for the ten years he worked for [Baker Hughes]."  (*Id.* at ¶ 57).  Harman copied all of his Baker Hughes e-mails and contacts information to an electronic-storage device.  "Many of the emails copied by Harman"—all of which were allegedly stored on Baker Hughes's Houston computer servers, "included [Baker Hughes's] trade secrets and confidential and proprietary

business contacts, as well as attachments that contain [Baker Hughes's] trade secrets and confidential and proprietary information related to optic fiber technology." (*Id.* at ¶ 60).

Homa and Harman resigned effective September 13. (*See id.* at ¶ 50). According to the second amended complaint, the next day the Austrian Defendants:

> held a press conference in Virginia announcing the formation of . . . U.S. subsidiary, FCTech. During the press conference, Karl Bauer, FCT's President and CEO, stated that FCTech planned to develop and manufacture "specialty optical fibers for sensing systems that have application to the Oil and Gas exploration, production and distribution market," the same technology on which Harman and Homa worked while at [Baker Hughes] . . . . Harman and Homa attended the press conference.

(*Id.* at ¶ 50). On September 23, Homa e-mailed many Baker Hughes employees a proposed Memorandum of Understanding between Baker Hughes and FCTech. The Memorandum discussed collaboration on fiber-optics sensing technology. (*Id.* at ¶ 51; *see also id.*, Ex. F). Bauer was copied on Homa's e-mail. (*Id.*). That same day, Baker Hughes sent letters to Homa and Harman reminding each of his "ongoing obligations as a former Baker Hughes employee" not to disclose Baker Hughes's trade secret, confidential, or proprietary information and to return any items containing such information. (*Id.*, Ex. G). After receiving this letter, "Harman told Homa to get rid of the [Baker Hughes] information." (*Id.* at ¶ 58). Homa did so by deleting all of the information on the two electronic-storage devices he had taken with him before he left Baker Hughes. Before Homa deleted the information he had transferred to those devices from the Baker Hughes computers, he reviewed it and copied some to other thumb drives. (*Id.*). The copied files contained Baker Hughes trade secrets pertaining to "manufacturing equipment and process documentation, fiber and cable engineering documentation, pricing, and other R&D documentation." (*Id.* at ¶ 56). Homa did not destroy the files he copied to the thumb drives.

11

On September 22, Giannis sent an e-mail to Homa, Harman, Bauer, and Rudolf Halmetschlager, a managing director of FCT and an executive officer of NBG Systems. The subject line of this e-mail read: "Christmas present for us all from Dan!!" Giannis reported that "Dan has given me all these information for us to use!" (*Id.*, Ex. 28 at 2).[3] Giannis attached two Excel spreadsheets containing Baker Hughes's pricing information. (*Id.*; *see also id.*, Ex. 30). Giannis joked that "I think we should prepare a nice 'thank you Dan' surprise by calling and telling on him at B.H. for corporate espionage sinc[e], 'no good deed goes unpunished' . . ., what do you guys think?" (*Id.*, Ex. 28 at 2). Giannis said that he had another file to send, but it was too "big" to attach. Homa responded that Giannis could send the thumb drive—an NBG Systems thumb drive—directly to Halmetschlager. (*Id.*; *see also id.*, Ex. 31).

Communications among Bauer, Giannis, Homa, and Harman continued during the FCTech start-up period. On September 30, Bauer sent an e-mail entitled "R&D in NBG" from his NBG e-mail address. The recipients included Homa, Harman, Giannis, Halmetschlager, and others with NBG e-mail addresses. The e-mail introduced "the new core R&D team in the NBG family" of "our newest investment in US with FCTech Inc. in Virginia." (*Id.*, Ex. 18 at 2). The "core team" included Homa. Bauer encouraged the "core team" to coordinate "[s]o decision could be done very quickly and we work over all our sister companies in trust and as a big family!!!" (*Id.*).

On October 16, FCTech, NBG Holding, and Botetourt County, Virginia entered into a "Performance Agreement." The County agreed to provide FCTech with government grants in exchange for the construction of the FCTech facility in the County. Bauer signed the agreement twice, once as President of FCTech, and once as CEO and General Manager of NBG Holding. (*Id.*, Ex. 20 at 6).

---

[3]  This email is referred to as the "Christmas Present Email."

Also in October 2011, FCTech provided a quote for selling downhole fiber-optic cable to the Houston-based Shell Oil Company, one of Baker Hughes's primary customers. As early as October 5, 2011, Homa and Harman communicated with a Shell Oil employee, Alan Reynolds, about the possibility of FCTech supplying Shell Oil with fiber-optic cable. (Docket Entry No. 146, Ex. 5 at 3–5). Reynolds was a former Baker Hughes employee. (Docket Entry No. 147, Ex. E at 105). Reynolds provided Homa and Harman the specifications Shell Oil needed. (Docket Entry No. 146, Ex. 5 at 3–4). After receiving the specifications, Homa and Harman corresponded with Bauer, Halmetschlager, and Giannis about how to get the materials to manufacture the fiber-optic cable for Shell Oil. (*See id.*, Ex. 4). Giannis contacted a vendor and secured a quote for the fiber that would be used. (*Id.*, Ex. 4 at 5–6; *id.*, Ex. 5). The vendor's quote listed Halmetschlager and Homa as "Contacts" and NBG Systems as the purchaser. (*Id.*, Ex. 5 at 1). Homa, Harman, Giannis, Halmetschlager, and Bauer corresponded about how much to charge for the fiber, FIMT, and other components that would be used to manufacture the fiber-optic cable. At one point, Bauer asked Homa if a 30% margin was enough. (*Id.*, Ex. 4 at 2). Harman, who was copied on the email, responded that Homa used a 30% margin in order to "win [FCTech's] first job and to get [FCTech's] foot in the door with Alan/Shell." (*Id.*, Ex. 4 at 1).

Sometime before October 21, FCTech communicated the complete quote to Shell Oil. (Docket Entry No. 147, Ex. E at 102). The record shows that it was the only quote FCTech gave. (*Id.*, Ex. E at 103). There is no evidence that Shell Oil accepted the quote, and no evidence that the Austrian Defendants used Baker Hughes's trade secrets to formulate the quote or complete any resulting order.

Baker Hughes filed suit against Homa, Harman, FCTech, FCT, and NBG Systems on October 21, 2011, then obtained an ex parte temporary restraining order.  (Docket Entry No. 1).  The TRO enjoined these five defendants "from disclosing or using, directly or indirectly, [Baker Hughes's] optical fiber and fiber-optic technology" and "from altering, destroying, deleting, or otherwise disposing of any hard drives, external-storage devices, electronic documents, or hard-copy documents, including research-and-development lab notebooks and R&D notes, that contain or are derived from [Baker Hughes's] trade secrets, confidential information, and proprietary information concerning optical fiber and fiber-optic technology."  (Docket Entry No. 6 at ¶ 2).  The TRO also required the defendants to "return to [Baker Hughes] any hard drives, external-storage devices, electronic documents, or hard-copy documents, that belong to [Baker Hughes] or were obtained or derived from [Baker Hughes's] trade secrets and confidential and proprietary information concerning optical fiber or fiber-optic technology."  (*Id.* at ¶ 3).  In response to the TRO, Homa deleted all of the files on the electronic-storage devices that he took from Baker Hughes before he resigned.  Homa returned the blank devices to Baker Hughes.  (*See* Docket Entry No. 125 at ¶ 59).  As noted, however, Homa had already transferred the files to two thumb drives.  (*Id.* at ¶ 58).

On November 25, this court extended and modified the TRO.  (Docket Entry No. 25).  In addition to the previous restrictions, the court ordered all five defendants to stop work on fiber-optic sensing technology in the downhole environment, to stop design and construction work on the FCTech facility, and to stop efforts to hire current or recent Baker Hughes employees.  (*Id.* at 2–3).

In December 2011, the court held an evidentiary hearing on Baker Hughes's application for a preliminary injunction.  (Docket Entry Nos. 43–44, 47).  At the close of the evidence, the court granted the application, although the relief was not as broad as Baker Hughes sought.  (Docket Entry

14

No. 47).   The restrictions contained in the preliminary injunction were similar to those in the modified TRO.  (*See* Docket Entry No. 53).  Under the preliminary injunction, however, the five defendants were allowed to provide FIMT, so long as the fiber was not designed or manufactured using Baker Hughes's trade secrets.  (*Id.* at 3–4).

Baker Hughes amended its complaint on January 11, 2012.  (Docket Entry No. 66).  In addition to supplementing the factual allegations, the amended complaint added NBG Holding as a sixth defendant and asserted a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against all defendants.

In March 2012, Baker Hughes settled its claims against Homa and Harman.  The court entered orders dismissing them from the case and permanently enjoining them from certain activities. (Docket Entry Nos. 94–95).  Also in March 2012, FCTech filed for Chapter 7 bankruptcy. The claims against FCTech were then severed from this suit and stayed.  (Docket Entry No. 97). That left the Austrian Defendants: NBG Holding, FCT, and NBG Systems.  These defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(2), 12(b)(4), and 12(b)(5).  (Docket Entry No. 84).

The court denied the Austrian Defendants' motion to dismiss for lack of personal jurisdiction and for insufficient service of process.  (Docket Entry No. 104 at 31).  Baker Hughes had made a preliminary—but not a prima facie—showing of personal jurisdiction.  There was sufficient record evidence to find the possible existence of minimum contacts between the Austrian Defendants and Texas.  (*Id.* at 22).  But the record evidence was insufficient to make a prima facie showing of the elements of specific jurisdiction as to each of the Austrian Defendants on each cause of action.  (*Id.* at 22-23).  The court granted Baker Hughes leave to conduct targeted jurisdictional discovery.

Specifically, discovery was granted to determine whether each defendant—NBG Holding, FCT, and NBG Systems—had the requisite minimum contacts with Texas, and whether those contacts had a nexus to each claim Baker Hughes alleged. (*Id.*). The court asked the parties to use the results of the discovery to address the capacity in which, and on whose behalf, Bauer and Giannis acted in their contacts with Texas. (*Id.* at 23-24). The court also asked the parties to develop the record on the recruitment of Norton, including who initiated it, the specific steps taken, and the timing. (*Id.* at 24). The Austrian Defendants were granted leave to reurge their motion to dismiss after a period for discovery. (*Id.* at 28).

While jurisdictional discovery was ongoing, Baker Hughes filed its second amended complaint on June 28, 2012. (Docket Entry No. 125). Baker Hughes asserted the following claims against the Austrian Defendants: unfair competition by misappropriation of trade secrets, (Count I); statutory theft, (Count II); unjust enrichment, (Count VII); and civil conspiracy, (Count VIII). Even though Homa and Harman were dismissed from the suit with prejudice, (Docket Entry Nos. 94–95), Baker Hughes's second amended complaint continues to list them as defendants for claims of conversion, (Count III); breach of contract, (Count IV); breach of fiduciary duties, (Count V); and violations under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(1), (Count IX).[4] (*See* Docket Entry No. 125, ¶¶ 86-99, 115–19).

The second amended complaint added Giannis as a defendant, alleging that he misappropriated Baker Hughes's trade secrets, interfered with Baker Hughes's contracts, and was a member of the alleged civil conspiracy. (*See id.* at ¶¶ 65-68). Giannis has not responded.

---

[4] Baker Hughes attempts to hold the Austrian Defendants liable for claims of conversion, breach of contract, breach of fiduciary duties, and violations of the Computer Fraud and Abuse Act on the basis that although the acts were done by Homa and Harman who are no longer parties to the suit, those acts are imputable to the Austrian Defendants because they were done in furtherance of a civil conspiracy in which the Austrian Defendants participated.

The pending motions are the Austrian Defendants' amended motions to dismiss for lack of personal jurisdiction and insufficient process and service, (Docket Entry No. 127, 143).  After jurisdictional discovery ended and the court resolved the discovery disputes, the court ordered Baker Hughes and the Austrian Defendants to each submit a supplemental brief explaining their primary factual and legal positions based on the expanded record.  (Docket Entry No. 181).  The parties complied.  (*See* Docket Entry Nos. 182 and 183).  The issues are as ready for ruling as they will ever be.

## II.    Personal Jurisdiction

The threshold issue is whether this Texas court may exercise personal jurisdiction over the Austrian Defendants.  If not, insufficiency of service is moot.  *Cf. Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 877–79 (7th Cir. 2006) (considering personal jurisdiction before the sufficiency of service).

### A.    The Applicable Law

When a nonresident defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of demonstrating facts sufficient to support jurisdiction.  *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010).  "At this preliminary stage"—when the court has not held an evidentiary hearing—"the plaintiff need only make a *prima facie* showing of jurisdiction."  *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 496 (5th Cir. 2012).  "In making its determination, the district court may consider the contents of the record before the court at the time of the motion, including affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."  *See Quick Techs.*, *Inc. v. Sage Grp. PLC*, 313 F.3d 338, 344 (5th Cir. 2002) (internal quotation marks omitted).  "[T]he court must accept as true all uncontroverted

17

allegations in the complaint and resolve any factual disputes in favor of the plaintiff." *ITL Int'l*, 669

F.3d at 496.  But the court is not obligated to credit conclusory allegations, even if uncontroverted.

*Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

"A federal district court sitting in diversity may exercise personal jurisdiction over a foreign

defendant if (1) the long-arm statute of the forum state creates personal jurisdiction over the

defendant; and (2) the exercise of personal jurisdiction is consistent with the due process guarantees

of the United States Constitution." *Clemens*, 615 F.3d at 378.  This two-step test is the same for

federal question cases when the applicable statute is silent on personal jurisdiction.  *See Fiore v.*

*Walden*, 657 F.3d 838, 845 (9th Cir. 2011); *see also Chloé v. Queen Bee of Beverly Hills, LLC*, 616

F.3d 158, 163–64 (2d Cir. 2010).  When the forum state is Texas, the two steps combine into

determining whether exercising personal jurisdiction offends federal due process, "[b]ecause Texas's

long-arm statute reaches to the constitutional limits." *Clemens*, 615 F.3d at 378 (citing *Helicopteros*

*Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984)).

Under the well-established law on federal due process and personal jurisdiction:

> The Due Process Clause of the Fourteenth Amendment permits a
> court to exercise personal jurisdiction over a foreign defendant when
> (1) that defendant has purposefully availed himself of the benefits
> and protections of the forum state by establishing minimum contacts
> with the forum state and (2) the exercise of jurisdiction over that
> defendant does not offend traditional notions of fair play and
> substantial justice.

*Id.*  As to the first prong, "[t]here are two types of minimum contacts: contacts that give rise to

specific personal jurisdiction and those that give rise to general jurisdiction." *Id.*  Because Baker

Hughes does not argue that this court may exercise general jurisdiction over the Austrian

Defendants, the issue is whether this court may exercise specific jurisdiction over them.  Resolving

18

this issue requires the court to analyze specific jurisdiction claim-by-claim. *See Willow Bend, L.L.C.*
*v. Downtown ABQ Partners, L.L.C.*, 612 F.3d 390, 393 (5th Cir. 2010) ("[S]pecific jurisdiction is
bound up with the claim asserted—it is claim-specific.").

"[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected
with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tire Operations, S.A.*
*v. Brown*, 131 S. Ct. 2846, 2851 (2011) (internal quotation marks omitted). "[I]solated or sporadic
contacts" with the forum state may create specific personal jurisdiction, "so long as the plaintiff's
claim relates to or arises out of those contacts." *ITL Int'l*, 669 F.3d at 499. "Where the plaintiff
alleges specific jurisdiction, as here, due process requires (1) minimum contacts by the defendant
purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the
plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable."
*Id.* at 498.

The first prong of the specific-jurisdiction analysis—minimum contacts by the defendant
purposefully directed at the forum state—has two overlapping elements: (1) minimum; and (2)
purposeful availment. For the first, "the relevant inquiry . . . is not one of *relative* contacts, but only
whether the defendants had sufficient *minimum* contacts with the state." *Id.* at 499 (emphasis in the
original). This principle led the Fifth Circuit in *ITL International* to overlook the fact that "much
of the relevant activity—perhaps the vast majority of it—had no connection to" the forum state. *Id.*
The second element, purposeful availment, "ensures that a defendant will not be haled into court
in a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or the unilateral
activity of another person or third party." *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of*
*Colo.*, 615 F.3d 364, 369 (5th Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475

(1985)).  "The 'minimum contacts' inquiry is fact intensive and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it reasonably anticipates being haled into court."  *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (internal quotation marks omitted).

Contacts need not occur physically within the forum state for a court in that state to exercise personal jurisdiction.  In intentional tort cases, the Fifth Circuit has applied the "purposeful direction" or "effects" test from *Calder v. Jones*, 465 U.S. 783 (1984).  *See Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 628–29 (5th Cir. 1999).  Under Fifth Circuit precedent:

> When a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal jurisdiction over the tortfeasor.  Additionally, even an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct.

*McFadin*, 587 F.3d at 759 (internal quotation marks, footnotes, and alterations omitted).

The second prong of the specific-jurisdiction analysis focuses on the nexus between the defendant's minimum contacts and the plaintiff's claims.  "[I]n addition to minimum contacts, specific jurisdiction only obtains when a plaintiff's claims 'arise out of or relate to' the defendant's purposeful contacts with the forum."  *ITL Int'l*, 669 F.3d at 500 (quoting *Burger King*, 471 U.S. at 472 & n.15).

After the plaintiff establishes minimum contacts and the nexus between those contacts and the claims, the burden shifts to the nonresident defendant to show that asserting jurisdiction is fair and reasonable.  *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 245 (5th

Cir. 2008).  The defendant must "ma[k]e a 'compelling case[]' that assertion of personal jurisdiction would offend traditional notions of fair play and substantial justice."  *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 402 (5th Cir. 2009) (quoting *Burger King*, 471 U.S. at 477).  "In conducting the fairness inquiry, [courts] examine (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies."  *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006).

## B.    Analysis

Baker Hughes offers two bases for subjecting the Austrian Defendants to jurisdiction in Texas:  Their alleged misappropriation and misuse of Baker Hughes's trade secrets; and their alleged recruitment of Homa, Harman, and Norton.  These allegations are analyzed under the *Calder* effects test because most of Baker Hughes's claims are tort claims under Texas law.  *See Trilogy Software v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.–Austin 2004, pet. denied) (misappropriation of trade secrets); *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 209 (Tex. 1996) (tortious interference with contract); *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) (civil conspiracy).  Before conducting the jurisdictional analysis, the court first considers whether the three Austrian Defendants are so closely related that they should be treated as a single entity for jurisdictional purposes.

### 1.    NBG Holding, NBG Systems, and FTC: One Entity or Three?

Baker Hughes contends that the court should treat NBG Holding, NBG Systems, and FTC as a single entity for the purpose of determining whether the companies are subject to personal jurisdiction in Texas.  (*See* Docket Entry No. 182, at 8–9).  There is a presumption in favor of

corporate separateness. *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999). "[T]ypically, the corporate independence of companies defeats the assertion of jurisdiction over one by using contacts with the other." *Access Telecom Inc. v. MCI Telecom, Inc.*, 197 F.3d 694, 717 (5th Cir. 1999) (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)). But "it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Patin v. Thoroughbred Power Boats Inc.,* 294 F.3d 640, 653 (5th Cir. 2002).

The alter ego doctrine "applies when there is such unity between the parent corporation and its subsidiary that the separateness of the two corporations has ceased." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593 (5th Cir. 1999). Applying this doctrine requires "proof of control by the parent over the internal business operations and affairs of the subsidiar[ies]" such that it "fuse[s them] for jurisdictional purposes." *Hargrave*, 710 F.2d at 1160. "[T]he alter ego test for attribution of contacts, i.e., personal jurisdiction, is less stringent than that for liability." *Stuart v. Spademan*, 772 F.2d 1185, 1198 n.12 (5th Cir. 1985). The party seeking to assert jurisdiction "need not [show] both the existence of a mere shell corporation and fraud. Rather, either factor, a shell corporation or fraud is sufficient by itself to justify jurisdiction." *Id.* (quoting 3A C. Swearingen, Fletcher's Cyclopedia of the Law of Private Corporations § 1296.1, at 81 (Supp. 1984) (footnotes omitted)).

The Fifth Circuit has identified a "laundry list" of factors that courts should apply in making an alter ego determination. *See United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 691-92 (5th Cir.

1985).   These factors include: (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the existence of separate headquarters for each entity; (3) the sharing of common officers and directors; (4) the observance of corporate formalities; (5) the maintenance of separate accounting systems; (6) the parent corporation's exercise of complete authority over the general policy of the subsidiary; and (7) the subsidiary's exercise of complete authority over its daily operations.  *Seitz v. Envirotech Sys. Worldwide Inc.*, 513 F. Supp. 2d 855, 865 (S.D. Tex. 2007) (citing *Hargrave*, 710 F.2d at 1160).

NBG Holding owns 95% of NBG Systems's shares; an NBG Holding executive owns the remaining 5%.  (Docket Entry No. 84, Ex. A at ¶ 6).  NBG Holding controls 80% of FCT's shares; the other 20% are owned by a separate Austrian corporation.  (*Id.* at ¶ 5).  Karl Bauer serves as the managing director for all three companies.  Bauer referred to the three companies as a "big family" that would work together "in trust" while developing intellectual property for their "common usage." (Docket Entry No. 182, Ex. 10, at 2).  The way the Austrian Defendants conducted business with Baker Hughes before FCTech shows a close connection.  Invoices and purchase orders sent to Baker Hughes for FIMT manufactured by FCT were printed on NBG Systems letterhead.  (Docket Entry No. 98, Ex. 8 at 2).  Bauer signed the invoices and purchase orders.  They stated that Baker Hughes would provide "NBG/FCT" with the fiber-optic cables that were to be housed in the metal tubes that FCT manufactured.  (*Id.*).

Although the three Austrian Defendants are clearly closely related, Baker Hughes has not presented sufficient facts showing that under the *Hargrave* factors the three are shells.  Specifically, Baker Hughes has not shown that: (1) the three companies maintained a single accounting system and pooled their money; (2) they failed to observe corporate formalities; or (3) NBG Holding

exercised complete authority over the general policy or the daily operations of FCT and NBG Systems.[5]  The *Hargrave* factors militate against finding that the companies are shells of each other. The record evidence does not overcome the presumption in favor of corporate separateness.  *See Dickson Marine Inc.*, 179 F.3d at 338.  This court will evaluate NBG Holding, FCT, and NBG Systems as separate entities for jurisdictional purposes.

### 2.        Jurisdiction Based on Alleged Misuse of Baker Hughes's Trade Secrets

Baker Hughes first argues that jurisdiction over the three Austrian Defendants in Texas is warranted on the basis of their alleged misappropriation of Baker Hughes's trade secrets and other related claims.  (Docket Entry No. 146, at 7).  The Austrian Defendants concede that in the "Christmas Present Email," Homa sent Baker Hughes's trade secrets to Giannis, who forwarded the email to Halmetschlager and Bauer.  (*Id.*, Ex. 2).  There is also evidence that a thumb drive containing Baker Hughes's trade secrets was sent to Halmetschlager.  (Docket Entry No. 182, Ex. 9 at 1) (Giannis stating that he "will sen[d] the drive to Rudi [Halmetschlager], if no better solution.").  But to assert personal jurisdiction over the Austrian Defendants in Texas, Baker Hughes must show that they did "something more" than receive and possess Baker Hughes's protected information.  That "something more" means conduct expressly aimed at Baker Hughes in Texas. *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1129 (9th Cir. 2010); *see also Revell v. Lidov*, 317 F.3d 467, 475 n.63 (5th Cir. 2002) (noting that "*Calder* requires that 'the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant *knows to be a resident of the forum state*'" (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (emphasis in *Revell*))).

---

[5]  Baker Hughes does not argue that the court should impute the actions of FCTech, Homa or Harman to the three Austrian Defendants.  (*See* Docket Entry No. 182, at 8-9).

The Supreme Court in *Calder* distinguished between cases of "untargeted negligence" and those involving intentional behavior knowingly directed at the plaintiff in the forum state. *See Calder*, 465 U.S. at 789.  In *Calder*, the intentional behavior occurred outside the forum state but was expressly aimed at and targeted the forum state because the defendant knew his conduct would have a "potentially devastating impact" upon the plaintiff, whom the defendant knew worked in the forum state. *See id.* at 789-90.  Requiring the defendant to target a resident of the forum state prevents a court from exercising jurisdiction when the defendant's act merely has a foreseeable effect on the plaintiff. *See Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 486 (5th Cir. 2008).

Baker Hughes asserts that "[e]ach Austrian Defendant played a role in using Baker Hughes's trade secrets to compete with Baker Hughes in Texas." (Docket Entry No. 146 at 8).  Baker Hughes claims that the Austrian Defendants used the trade secrets, some of which may have been included in the Christmas Present Email, to formulate a quote for fiber-optic cable to the Shell Oil Company, one of Baker Hughes's customers. (*Id.* at 7-8).  The Shell Oil quote was FCTech's first attempt at a sale. (*See id.*, Ex. 4 at 1) (Harman stating to Bauer in an email that "it's important to win our first job and to get our foot in the door with []Shell").  Baker Hughes cites email correspondence among Homa, Bauer, Giannis, and Halmetschlager as evidence that the Austrian Defendants competed against Baker Hughes using Baker Hughes's trade secrets.  As explained below, these emails do not adequately show that the Austrian Defendants participated in the Shell Oil quote, and even if they did participate, there is no evidence that they used Baker Hughes's trade secrets in doing so or in taking further steps.

To prove that NBG Holding and NBG Systems participated in the Shell Oil quote, Baker Hughes points to an October 2011 email between Bauer and Homa in which Bauer asked Homa if

a 30% gross margin was the "typical price level" for the product  quoted to Shell Oil.  (*Id.* at 2).
This question does not indicate that Bauer played a significant role in formulating the quote.  Baker
Hughes has also not shown that Bauer's question relied on or sought to elicit a response using Baker
Hughes's trade secrets.  Even assuming that Bauer participated in the quote while acting on behalf
of NBG Holding and NBG Systems, Baker Hughes has not shown a connection or nexus between
the quote and the alleged misappropriation of Baker Hughes's trade secrets, which must be shown
to satisfy the second prong of the specific jurisdiction test.  *See ITL Int'l*, 669 F.3d at 500.

In addition to the lack of evidence showing that Bauer's question used or implicated Baker
Hughes's trade secrets, there is no evidence that Bauer was acting on behalf of NBG Holding and
NBG Systems as opposed to FCTech when he sent the October 2011 email.  The record supports
an inference that Bauer was acting as FCTech's managing director when he sent the email.  FCTech
was the company created to supply fiber-optic cable of the type quoted to Shell Oil.  Harman stated
that he hoped the Shell Oil quote would result in FCTech's "first job."  (Docket Entry No. 146, Ex.
4 at 1).  The quote was going to be delivered on FCTech letterhead.  (*See id.* at 7).  NBG Holding
and NBG Systems did not manufacture the type of product involved in the Shell Oil quote.  Nor did
they conduct regular business in the United States.  Again, the record supports an inference that
Bauer was acting as FCTech's managing director when he asked Homa, an FCTech employee, about
the margin percentage.  The October 2011 email from Bauer to Homa  does not support jurisdiction
over NBG Holding and NBG Systems.

Baker Hughes argues that NBG Systems participated in the Shell Oil quote by soliciting a
quote from a vendor for the price of the fiber that could be used in manufacturing the fiber-optic
cable.  (Docket Entry No. 182, at 5).  Emails exchanged among Homa, Halmetschlager, and Giannis

26

indicate that Giannis negotiated with the vendor on the price of fiber.  (*Id.*, Ex. 11 at 5-6).  But there is no evidence that Giannis used Baker Hughes's trade secrets to formulate the terms of the fiber quote.  The solicitation of the fiber quote does not represent conduct expressly aimed at Texas that subjects NBG Systems to jurisdiction there.

With respect to FCT, Baker Hughes argues that Halmetschlager used the confidential pricing information that Homa provided to determine what percentage of the Shell Oil quote's total cost should be represented by FIMT.  (Docket Entry No. 146, at 8).  Baker Hughes cites an email from Halmetschlager to Giannis in which Halmetschlager tentatively provides pricing information for the FIMT and fiber components of the quote.  (*Id.*, Ex. 5 at 12).  But again, there is no indication that Halmetschlager used Baker Hughes's trade secrets to determine the prices.  Halmetschlager asked Giannis, "[D]o you think that you can live with this price level[?]  I know it is just a beginni[n]g of [the] discussion." (*Id.*).

In sum, the evidence as to the Shell Oil quote does not demonstrate that the Austrian Defendants used Baker Hughes's trade secrets.  Baker Hughes has not shown that the Austrian Defendants expressly aimed their conduct at Baker Hughes in Texas.[6]

Baker Hughes cites *Aerotech Holdings, Inc. v. Alliance Aerospace Engineering, LLC*, 650 F. Supp. 2d 594 (N.D. Tex. 2009), a recent decision involving the misappropriation of trade secrets.

---

[6]  Baker Hughes also argues that the Austrian Defendants expressly aimed their conduct at Texas on the basis that Homa and Harman accessed Baker Hughes's Texas-based servers to obtain the trade secrets.  (Docket Entry No. 182, at 7).  Other than allegations in the second amended complaint, (Docket Entry No. 125, at § 66), there is no evidence that the information Homa and Harman copied was located on Texas-based servers as opposed to servers or computers located at Baker Hughes's Blacksburg, Virginia facility.  Even if Baker Hughes could show that the information was accessed from servers located in Texas, Baker Hughes has not shown that Homa and Harman knowingly accessed Texas-based servers.  *See Chang v. Virgin Mobile*, No. 3:07-cv-1767, 2009 WL 111570, at *3-4 (N.D. Tex Jan. 16, 2009) (declining to exercise personal jurisdiction in Texas over the misuse of a downloaded photograph when the plaintiff could not show that the defendant knew that the server was located in Texas).  Nor has Baker Hughes shown that Homa and Harman copied the information at the direction of the Austrian Defendants.  The allegation that Homa and Harman accessed Texas-based servers does not support jurisdiction over the Austrian Defendants.

The district court found that a nonresident company was subject to jurisdiction in Texas. The nonresident company obtained the trade secrets of its competitor, a Texas-based company, by hiring a former employee of the competitor. *Id.* at 601. The nonresident company used the trade secrets to "target" the Texas company's customers. *Id.* The court held that the nonresident company "purposefully directed its conduct at Texas by using confidential information that belong[ed] to a Texas company to target customers that are based in Texas." *Id.*

This case is distinguishable from *Aerotech*. In *Aerotech*, the nonresident employer used the plaintiff's trade secrets to target the plaintiff's customers. In this case, Baker Hughes has not shown that the Austrian Defendants used Baker Hughes's trade secrets to formulate the Shell Oil quote or otherwise target Baker Hughes's customers. Similarly, there is no evidence that the Austrian Defendants competed with Baker Hughes for business in Texas. The Austrian Defendants did not sell the same products as Baker Hughes. Rather, it was FCTech that was formed to compete with Baker Hughes in the U.S. fiber-optic cable market. (*See* Docket Entry No. 182, Ex. 1 at 2). *Aerotech* does not weigh in favor of finding that the Austrian Defendants are subject to jurisdiction in Texas.

### 3.    Recruitment of Baker Hughes Employees

Baker Hughes alternatively asserts that the Austrian Defendants recruited Baker Hughes employees Homa, Harman, and Norton, and that their recruitment establishes minimum contacts with Texas.

With respect to Homa and Harman, Baker Hughes claims that Bauer recruited them on behalf of NBG Holding.  (Docket Entry No. 146, at 12-13).  Baker Hughes, however, does not appear to argue that NBG Systems or FCT recruited the two employees.  (*See id.*).  The recruitment of Homa and Harman may support jurisdiction only over NBG Holding, but not the other two defendants.

Baker Hughes relies on *Montana Silversmiths, Inc. v. Taylor Brands, LLC*, 850 F. Supp. 2d 1172 (D. Mont. 2012), to argue that a defendant's act of recruiting an employee from the plaintiff is enough to establish jurisdiction in the state where the plaintiff resides, even though the recruited employee never worked or resided in the forum state.  (Docket Entry No. 146, at 12-13).  In *Montana Silversmiths*, a Montana jewelry maker sued a former employee and a Tennessee jewelry maker in the District of Montana.  *Id.* at 1175.  Unbeknownst to the Montana company, the former employee had worked concurrently for both the Montana and Tennessee companies.  *Id.* at 1176. The employee allegedly provided the Tennessee company with the Montana company's trade secrets, which the Tennessee company used to make products that competed with the Montana company's products.  *Id.* at 1180.  The Montana court found jurisdiction over both the Tennessee company and the former employee.  *See id.* at 1180-1181.  The court explained that it had jurisdiction over the Tennessee company because it "unfairly competed" against the Montana company by using trade secrets improperly obtained from that company's former employee.  *Id.* at 1182.

Baker Hughes's reliance on *Montana Silversmiths* is unavailing. In *Montana Silversmiths*, like *Aerotech*, the court held that a nonresident employer may establish minimum contacts with the forum state by recruiting an employee of a plaintiff company, and then using that employee to get the plaintiff's trade secrets and using those trade secrets to compete against the plaintiff.  *Montana*

29

*Silversmiths* does not state that a nonresident employer who recruits an employee becomes subject to jurisdiction in the state where the employee's former employer resides.  If recruiting a competitor's employee in such circumstances was enough for jurisdiction, a nonresident employer could be "haled into court . . . as a result of random [and] fortuitous . . . contacts."  *See Choice Healthcare, Inc.*, 615 F.3d at 369.

The plaintiff company in *Montana Silversmiths* argued that jurisdiction was warranted on the basis of the employee's recruitment alone.  But the court did not decide that the recruitment by itself was sufficient to establish the defendant's minimum contacts with Montana.  *Mont. Silversmiths*, 850 F. Supp. 2d at 1182.  The focus of the court's opinion was on the nonresident defendant's use of the plaintiff's former employee to acquire and later improperly use the plaintiff's trade secrets.

Baker Hughes asks this court to infer that Bauer recruited Homa and Harman in order to obtain Baker Hughes's trade secrets.  Baker Hughes points to the timing of their recruitment, the formation of FCTech, and the "Christmas Present Email" in support.  (Docket Entry No. 146, at 7).  But, as discussed earlier, Baker Hughes has not shown that the Austrian Defendants used Baker Hughes's trade secrets, either in the Shell Oil quote or otherwise, to target Baker Hughes in Texas.  The inferences that Baker Hughes asks the court to draw are too speculative to establish a prima facie case of jurisdiction.

The recruitment of Homa and Harman is more analogous to a case cited by the *Montana Silversmiths* court, in which the recruiting of an employee who did not reside in the same state as his former employer was insufficient to confer jurisdiction.  In *Drayton Enterprises, L.L.C. v. Dunker*, 142 F. Supp. 2d 1177 (D.N.D. 2001), an Oklahoma company recruited and hired a

Minnesota resident who previously worked for a North Dakota company.  While working for the North Dakota company, the Minnesota resident obtained the North Dakota company's trade secrets. *Id.* at 1183.  The North Dakota company sued the Oklahoma company in the District of North Dakota, alleging that the Oklahoma company misappropriated its trade secrets.  *Id.* at 1180.  The court concluded that the Oklahoma company's recruitment of the Minnesota resident did not establish minimum contacts with North Dakota.  The court explained that the Oklahoma company did not "reach into" the forum state to recruit the Minnesota resident.  *Id.* at 1184.  Like the Oklahoma company in *Dratyton*, Bauer did not "reach into" Texas to recruit Homa and Harman, who were both residents of Virginia.  The Austrian Defendants are not subject to jurisdiction in Texas on the basis of the recruitment of Homa and Harman.

Baker Hughes also contends that the Austrian Defendants' alleged recruitment of Norton, Baker Hughes's Houston-based Senior Technical Advisor for fiber-optics sensing, shows minimum contacts with Texas.  In the earlier Memorandum and Order, this court noted that the circumstances surrounding Norton's recruitment were unclear.  (Docket Entry No. 104, at 24).  Specifically, it was unclear who initiated the recruiting effort, when it occurred, and what was actually done.  *See id.* Baker Hughes claimed that Bauer contacted Norton, but it was unclear whether Bauer was acting as FCTech's managing director or on behalf of one of the Austrian Defendants.  (Docket Entry No. 104, at 24).  Targeted jurisdictional discovery was granted to answer these questions.  That discovery did not answer the questions.  The court cannot determine if Bauer contacted Norton before or after FCTech was formed, or whether Bauer was acting on behalf of the Austrian Defendants.  The content of the communications between Norton and the Austrian Defendants is not in the record.  It is unclear from the record when, how, or how seriously Norton was recruited.

31

Again, the record supports an inference that efforts to recruit Norton were likely for FCTech, not the Austrian Defendants.  Norton had specialized knowledge of fiber-optic cable technology and manufacturing that was relevant to the products that FCTech was trying to sell.  Baker Hughes nonetheless claims that an email sent to Norton by a member of NBG Holding's "Management Assistance" group stating that she was "responsible" for planning his trip to Roanoke is proof that NBG Holding recruited Norton.  (*See* Docket Entry No. 90, Ex. 17, at 1).  But that evidence also supports an inference that the person coordinating Norton's travel arrangements was acting at the direction of FCTech.[7]

Even assuming that NBG Holding sent the email to Norton for the purpose of trying to recruit him to work for NBG Holding, that email by itself would be insufficient to establish minimum contacts with Texas.  A telephone call to a potential recruit from a prospective employer is insufficient to establish minimum contacts in the recruit's state.  *See Morris v. B.C. Olympiakos, SFP*, 721 F. Supp. 2d 546, 560 (S.D. Tex. 2010) (holding that a single telephone call from a prospective foreign employer to a Texas resident did not establish minimum contacts with Texas).  If a telephone call from a prospective employer does not establish minimum contacts, nor should a single email.  *Cf. Clark Moran Towing & Transp. Co., Inc.*, 738 F. Supp. 1023, 1029-30 (E.D. L.A 1990) (finding jurisdiction based on the nonresident entity's recruitment activities directed to the state by advertising in a local newspaper and conducting interviews in the state); *Gonsalez Moreno v. Milk Train, Inc.*, 182 F. Supp. 2d 590, 594 (W.D. Tex. 2002) (finding jurisdiction based on the

---

[7] Baker Hughes also refers to an affidavit from Norton as evidence that FCT, and not FCTech, recruited him. (*See* Docket Entry No. 146 at 4).  Norton stated in this affidavit that Homa and Harman solicited him to join the two at FCT.  (Docket Entry No. 98, Ex. 16).  It is unclear if Norton was referring to FCTech.  Norton stated in his affidavit that Homa and Harman were planning on leaving Baker Hughes for "FCT."  (*Id.*).  But Homa and Harman never worked for or planned on working for Austrian-based FCT.  They solicited only for FCTech.  Homa, Harman, and Norton's specialized knowledge of fiber-optic cable technology and manufacturing was irrelevant to FCT's business, which focused on manufacturing the metal tubes that fiber-optic cables are housed in.

defendant's contacts with a farm-labor service to recruit Texas residents for migrant farm employment in New York, when the contacts included providing the farm-labor service with the terms and conditions of employment, paying the service a fee for each migrant worker it supplied, hiring the plaintiffs as a result of the service's recruiting work in Texas, and paying the plaintiffs' bus fare to New York).

Baker Hughes has not established that hiring Homa and Harman or the efforts to recruit Norton warrant jurisdiction over the Austrian Defendants.[8]   Because Baker Hughes has not established that the Austrian Defendants have minimum contacts with Texas, it is unnecessary to address whether asserting jurisdiction in Texas is reasonable.

The lack of personal jurisdiction over the Austrian Defendants also makes their motion to dismiss for insufficient service of process under Rule 12(b)(5) moot.

## III.    Conclusion

The Austrian Defendants' second motion to dismiss for lack of personal jurisdiction, (Docket Entry No. 143), is granted.  Because no other federal district court would have jurisdiction over the Austrian Defendants, the claims against NBG Holding, NBG Systems, and FCT are dismissed.  By

---

[10]   Baker Hughes asks the court to establish facts sufficient to support personal jurisdiction as a sanction for the Austrian Defendants' allegedly obstructionist conduct during jurisdictional discovery.  (Docket Entry Nos. 146 at 14; 182 at 9-10).  A district court, as a sanction for failure to comply with discovery orders, may order the matters at issue or other designated facts to be "established" for purposes of the action.  FED. R. CIV. P. 37(b)(2)(A)(i); *see, e.g.*, *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee (Compagnie des Bauxites)*, 456 U.S. 694, 695 (1982) (holding that a district court did not abuse its discretion in finding personal jurisdiction as a sanction where the plaintiff repeatedly attempted to use discovery to establish jurisdictional facts, only to be obstructed by defendant's refusal to produce the requested information).  A sanction under Rule 37 must be "just."  *Compagnie des Bauxites*, 456 U.S. at 707.  Although discovery was difficult in this case, the Austrian Defendants' conduct was not so recalcitrant to warrant finding personal jurisdiction as a sanction.  It is unclear how much of the difficulties associated with discovery arose from attempting American discovery under Austrian rules, in Austria, and against Austrian companies, or from sanctionable obstruction on the part of those companies. The court declines to establish facts supporting jurisdiction in Texas.

**October 30, 2013**, the parties are to file a statement identifying any issues that remain to be resolved or a proposed form of order dismissing the case.

SIGNED on October 25, 2013, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge